405 So.2d 916 (1981)
GULF ATLANTIC LIFE INSURANCE COMPANY, a corporation
v.
Rosezenna BARNES.
80-256.
Supreme Court of Alabama.
October 2, 1981.
*917 Alex T. Howard, Jr., and Steven T. Stine of Johnstone, Adams, May, Howard & Hill, Mobile, and J. Connor Owens, Jr. and Charles C. Simpson, III, Bay Minette, for appellant.
James R. Owen of Owen & Ball, Bay Minette, for appellee.
BEATTY, Justice.
Rosezenna Barnes, the appellee, filed suit in the Circuit Court of Baldwin County against the Gulf Atlantic Insurance Company, the appellant. The action arose out of a dispute between the parties concerning the amount of coverage to which the appellee was entitled as a result of the death of one of her children, an insured.
Plaintiff's complaint, as finally amended, contained four counts: (1) breach of contract for life insurance, (2) fraud and misrepresentation, (3) wrongful, intentional and unreasonable refusal to pay and (4) negligent or wanton breach of an implied duty to deal in good faith and to exercise due care in the contractual relationship. With respect to count one, plaintiff demanded judgment in the amount of $7,000, which she claimed was the face amount of the policy. As to counts two, three and four, plaintiff demanded judgment in the amount of $2,500,000.
The Company contended that it owed only $1,000, the amount of insurance plaintiff applied for, and that $1,000 of the $7,000 claimed under count one had been paid. The Company, by counterclaim, sought reformation of the contract of insurance based upon the following allegations: (a) that the plaintiff applied for benefits of $9,683 in the event of her death and $1,000 in the event of a child's death; (b) that the policy makes the application part and parcel of the insurance contract; (c) that through a mistake in encoding, the initial policy issued to the plaintiff shows that $7,437 was payable in the event of her death and that $7,000 was payable in the event of an insured child's death; and (d) that the policy *918 did not reflect the understanding between the parties and was due to be reformed to reflect $9,906 in benefits on the plaintiff's life and $1,000 in benefits on each child's life.
The case was tried before a jury on April 16, 1980. At the close of the presentation of the evidence and upon the appropriate motions, the trial court directed a verdict in favor of the Company on count two (fraud and misrepresentation), but denied the Company's motions for directed verdict as to counts one, three and four; the court also denied the plaintiff's motions for directed verdict as to counts one, three and four.
The jury returned a verdict for the plaintiff on counts one, three and four in the amount of $1,100,000 "compensatory and punitive damages plus $6,000 plus interest from balance due on policy 9/4/78." The Company filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial, which motion the trial court denied.
The Company raises the following issues on appeal: (1) whether an insurer is liable in tort for the failure to pay the larger of two amounts as to which there is a legitimate question regarding which is the proper coverage amount; (2) whether it was error for the trial court to refuse to reform the contract; (3) whether it was error for the trial court to limit the opening statement of the appellant and to sharply admonish the counsel for the appellant in the presence of the jury; (4) whether a cause of action for intentional bad faith should support an award of punitive damages unless the actions of the defendant were malicious, oppressive, gross or committed with intent to injure; (5) whether the trial court erred in overruling appellant's objection to improper closing argument on the part of the appellee; (6) whether the trial court erred in admitting certain evidence over the appellant's objections; (7) whether the trial court erred in giving certain jury instructions requested by the plaintiff, and in refusing certain instructions requested by the Company; and (8) whether the trial court erred in denying the Company's motion for new trial.
Rosezenna Barnes, a resident of Baldwin County, Alabama, applied to purchase insurance from Gulf Atlantic at her home in February or March of 1978. Mr. T. A. Sherman of the G. L. Sherman and Associates Insurance Agency, which is located in Pascagoula, Mississippi, met with Mrs. Barnes at that time to discuss an insurance program approved by her credit union. Employees of G. L. Sherman and Associates sold life insurance to members of the Bay Slacks Credit Union, which was affiliated with Mrs. Barnes's employer, Manor Slacks Company. Sherman and Associates forwarded applications received from Manor Slacks employees, such as Mrs. Barnes, to Gulf Atlantic in San Francisco. Testimony presented at trial tended to show that the Bay Slacks Credit Union had an arrangement with Gulf Atlantic whereby the Credit Union would lend its members the amount of the yearly premium on the insurance purchased by participating employees and forward the premium to Gulf Atlantic. In return for the money lent to purchase insurance, employees, such as Mrs. Barnes, signed a note for the loan and also executed an agreement whereby certain payments were withheld from the paychecks of the participating employees to be applied to the repayment of the premium loan. In Mrs. Barnes's case, her premium was $4.00 each week, or $208 annually, which was deducted from her wages in order to repay the premium loan advanced by the Bay Slacks Credit Union.
T. A. Sherman, the G. L. Sherman and Associates employee who contacted Mrs. Barnes, testified that he and Frank Williams, a co-employee, went to Mrs. Barnes's home one evening in February or March, 1978, and presented their insurance program to her. That evening Mrs. Barnes signed an application of insurance and Mr. Sherman completed the application in her presence with the exception for his agent's report on the back of the application. Mr. Sherman testified that he informed Mrs. Barnes that she would receive $9,683 insurance *919 for herself, and $1,000 coverage on each of her seven children. Mr. Sherman filled out the amount of insurance in her presence. The application, without dispute, shows these amounts of insurance applied for. The testimony of Mrs. Barnes conflicted with that of Mr. Sherman, however, she testified:
Q What did these gentlemen tell you about this insurance policy?
A Well, they asked me was I interested in joining good insurance from Gulf Atlantic and I was undecided and tried [sic] if they could explain it to me
Q How were the premiums to be paid for this policy?
A I was suppose [sic] to pay four dollars a week and I got paid every two weeks and that made it eight dollars every two weeks.
Q Were there some kind of arrangements where you could do it through your credit union at Manor Slacks?
A Yes.
Q As a result of this conversation with these agents did you agree to take out an insurance policy with Gulf Atlantic Life Insurance Company?
A Yes.
Q What coverage did these agents tell you you were to receive under this policy?
A They said I would get seven thousand dollars on each child and talked about seventy-two thousand dollars [sic] on myself.
Q You mean seventy-four hundred on yourself?
A Yes, when it came back it was seven thousand four hundred and something on myself.
Q How much was it on the children?
A Seven thousand.
Q All right. Did you sign an application when these gentlemen were out there?
A Yes.
In directly conflicting testimony, Mr. T. A. Sherman stated that Mrs. Barnes had not told him that she wanted approximately $7,500 insurance on her own life, and he also said that he did not ever discuss with Mrs. Barnes any amount of insurance for her children other than the $1,000 amount. Mr. Sherman added that, under the insurance plan in which Mrs. Barnes enrolled, coverage for any child under the children's rider benefit in an amount in excess of $1,000 was not available.
Subsequently, Mrs. Barnes received through the mail in or around April of 1978, a policy of insurance which is the subject of the controversy. The application attached to the policy showed that Mrs. Barnes applied for $9,683 insurance on her own life and $1,000 children's rider benefit coverage on each of her seven children. The computer printout page of the policy which was received by Mrs. Barnes, however, indicates that Rosezenna Barnes, the primary insured, was insured for $7,437, not the $9,683 amount that appeared in the application for insurance. Additionally, the policy shows a face amount of $7,000 children's rider insurance instead of the $1,000 on the application for children's rider benefits for each child.
The circumstances directly giving rise to the instant lawsuit were triggered in September of 1978, on the death of Glenn E. Barnes, one of the children of Rosezenna Barnes who was listed in the application of insurance signed by Mrs. Barnes earlier that year.
After her son's death, Mrs. Barnes assigned the policy of insurance in question to Hodge's Funeral Chapel, the funeral home which handled her son's burial. Hodge's Funeral Chapel gave Mrs. Barnes photocopies of a portion of the policy, including the computer printout page, but did not furnish her with a photocopy of the application.
Following the death of her son, Mrs. Barnes called Gulf Atlantic in San Francisco to report her son's death, and with the help of Frank Williams, an employee of G. L. Sherman and Associates Insurance Agency, filled out and submitted a claim to Gulf Atlantic with respect to her son's death. Subsequently, Mrs. Barnes retrieved the initial policy from Hodge's Funeral Chapel and submitted it to Gulf Atlantic in San Francisco in support of the death claim.
*920 The death claim was processed by Clifford "Steve" Rabisa, the death claims examiner for Gulf Atlantic. On October 31, 1978, Gulf Atlantic issued a $7,000 check payable to Mrs. Barnes. Mr. Rabisa testified that he believed the $7,000 amount was the correct children's rider benefit because the policy issued called for seven units of children's rider benefits at $1,000 per unit. Thereafter, the $7,000 check was sent to Mr. Luther Douglas Burchinal of the G. L. Sherman and Associates Agency in Pascagoula, Mississippi, for transmittal to Mrs. Barnes. On receipt of the check, Mr. Burchinal called the home office of Gulf Atlantic in San Francisco to report that the $7,000 benefit amount was incorrect and that the $7,000 amount was not the proper children's benefit for which Mrs. Barnes had applied. When informed by Steve Rabisa of the discrepancy between the $1,000 application and the $7,000 figure on the computer printout, William Millar, the Assistant Vice President of Underwriting at Gulf Atlantic went to the coding division of the policy issue department to inquire about the discrepancy.
What did Gulf Atlantic do when it discovered what it claimed was an encoding error?
Millar testified as to the procedure followed by Gulf Atlantic in processing applications like that submitted by Mrs. Barnes. He stated that the Barnes application was submitted to a Gulf Atlantic underwriter for review. In this case, the underwriter, Jane Roelig, testified that she reviewed the Barnes application, and that she approved it and forwarded the application and underwriter's data sheet to the policy issue department. She stated that the application she approved in the Barnes situation called for one unit of children's rider benefits which provided $1,000 for each child. She added that under the Gulf Atlantic insurance program in which Mrs. Barnes participated, the insured paid the same amount of premium for one unit of children's rider benefit regardless of the number of children insured thereby.
Uncontradicted testimony showed that following approval by the underwriter, the application was forwarded to a "coder" in the policy issue department. Millar stated that the duty of the coder was to examine the application and prepare a coding sheet from which the relevant information could be fed into a computer. The end product of the work done by a coder at Gulf Atlantic is the computer printout page which was attached to the Barnes policy. Diane Drapel, who was employed at Gulf Atlantic on or about the date of the issuance of the initial Barnes policy, coded the Barnes policy.
The final step of the process of issuing policies at Gulf Atlantic was the review of the Barnes policy by a "policy checker." Marilyn Drapel, who checked the Barnes policy, stated that the principal duty of the policy checker entailed reviewing the policy to determine whether the premium amounts noted thereon were correct and to assure that the policy issued matched the application.
The uncontradicted testimony produced at trial indicated that the discrepancy in the amount of insurance on the Barnes application and the amount appearing on the computer printout page of the same policy occurred in the following manner: After Jane Roelig received and processed the application, the application went to Diane Drapel, the encoder in the policy issue department; instead of encoding one unit of children's rider insurance, she mistakenly encoded seven units because she did not know that by encoding one unit she would thereby provide $1,000 of children's rider coverage for each of Mrs. Barnes's seven children. Diane Drapel testified that the coding of insurance policies for employees of the Manor Slacks Company was "something totally new" to her, and that she had only coded a few of those policies at the time of the Barnes application. She further testified that at the time she coded the Barnes policy she did not know that one unit of children's rider provided $1,000 coverage for each of the Barnes children regardless of how many children were in the family. Acting under the mistaken impression that she had to code a unit for each of the seven children, Diane Drapel programmed into *921 the computer seven units of children's rider benefits, or $7,000 for each child. Diane Drapel further testified that she was under the impression that what she was doing would result in a total of $7,000 children's rider benefit which would be divided and split among each of the seven children and that each child would, therefore, receive $1,000 coverage.
According to the testimony of William Millar, the effect of the coding error by Diane Drapel was to reduce the amount of coverage for Mrs. Barnes to the $7,437 amount that appeared on the computer printout page of the initial policy. Mr. Millar explained that Mrs. Barnes had agreed to pay premiums totaling $208 annually. He stated that the premium on each unit of children's insurance for the Manor Slacks program was $7.50 per unit, and that the premium for one unit of children's rider benefit remained $7.50 regardless of how many children were in the Barnes family. Herein, Mr. Millar stated that the computer was programmed to first sell one unit of children's rider coverage (i. e., term coverage) and thereafter apply the balance of the remaining premium amount in order to purchase whole life insurance on Mrs. Barnes, the primary insured. He testified that if the one unit of children's coverage at the $7.50 per unit premium had been properly coded into the computer, Mrs. Barnes would have received the amount of insurance provided in the corrected policy.
In the Barnes situation, however, Mr. Millar testified that because seven units of children's rider benefits were incorrectly coded, $52.50 of the annual premium of $208.00 was first applied by the computer to sell the incorrect amount of children's rider coverage. Millar stated that the effect of the coding error which resulted in the purchase of seven units of insurance was to reduce the amount of the premium that was applied to Mrs. Barnes, the primary insured. Millar stated that when the computer printout which was formulated on the mistake of Diane Drapel was examined, one of the coders in the policy issue department entered the $7,437 amount figure in the HOME OFFICE ENDORSEMENT ONLY space of the application. No such entry was placed in such HOME OFFICE ENDORSEMENT ONLY space with respect to the amount of children's rider, which on the application remained $1,000.
Marilyn Drapel, the policy checker who reviewed the Barnes policy after the coder fed what the Company contended was the incorrect information into the computer, stated that she had done very little work with policies of insurance regarding Manor Slacks employees at the time of the Barnes application, and that she did not recognize any mistake on the Barnes policy after it had been coded because she, like her sister Diane, did not know that to accomplish $1,000 children's rider coverage for seven children it was only necessary to encode one unit. She testified that she mistakenly thought that to issue $1,000 coverage to each of the seven children one would have to encode seven units and did not realize that by encoding seven units this would cause the computer to issue $7,000 of children's rider to each of the seven children.
Millar, the assistant vice president of Underwriting, testified that when he discovered Diane and Marilyn Drapel's mistake, he determined that the check should have been issued for $1,000 not $7,000, and so advised Mr. Rabisa. Accordingly, Gulf Atlantic issued a new check on November 3, 1978, for $1,000, and Rabisa was directed by William Millar to issue a corrected policy that would restore the amount of permanent insurance for Mrs. Barnes to the level shown in the application and decrease the children's rider coverage from $7,000 to the $1,000 amount. Millar stated that he gave the instructions regarding the corrected policy in order to reverse what had been done and to revert back so that the policy of insurance for Mrs. Barnes would be written as the Company contended it should have been done in the first instance.
Thereafter, the $1,000 children's rider benefit check was forwarded to Mr. Burchinal in Pascagoula for delivery to Mrs. Barnes. Frank Williams, the G. L. Sherman and Associates employee who had *922 helped Mrs. Barnes prepare the necessary claim information, testified that the $1,000 check was delivered to Mrs. Barnes in the office of Mrs. Ann Neighbors, the bookkeeper of the Bay Slacks Credit Union at Mrs. Barnes's place of employment. At the time of the meeting in Mrs. Neighbor's office, Frank Williams testified that either Mrs. Barnes or Ann Neighbors had brought up the fact that one of them or someone at Hodge's Funeral Chapel thought that the benefit should be greater than $1,000. Frank Williams stated that he told Mrs. Barnes and Ann Neighbors that the benefits payable were $1,000 and that no more than $1,000 was available. Mr. Williams said that he thereafter gave the check to Mrs. Barnes and that he had not heard anything else about Rosezenna Barnes or the check until the instant lawsuit, which was filed on June 22, 1979. Mr. Williams stated that he recalled transmitting the check to Mrs. Barnes in November of 1978.
Mrs. Barnes testified after receiving the $1,000 check, she negotiated it. She received the corrected, new policy of insurance, which the Company claimed reflected the intent of the application.
Mrs. Barnes testified she showed one or two photocopies of the initial policy to both Ann Neighbors of the Credit Union office and to Carmen Fuller, a co-employee at Manor Slacks. Mrs. Fuller testified that Rosezenna Barnes told her that she (Mrs. Barnes) was to receive $7,000 insurance on the life of each child, and that something was wrong because the revised policy reflected only $1,000. Mrs. Fuller also testified that on one occasion she had seen Mrs. Barnes put her head down and cry while at work, and that Mrs. Barnes had discussed with her certain problems she was having concerning a large bill with the mortician who handled her son's burial. Mrs. Fuller recounted that at that time Mrs. Barnes said, "I don't know what I'm going to do," whereupon Mrs. Fuller advised Mrs. Barnes to consult an attorney and show both policies to the attorney.
At trial, Mrs. Barnes testified that she had never received any explanation from anyone regarding the difference between the $7,000 amount on the face of the initial policy and the $1,000 payment she received. On the other hand, there was testimony of Frank Williams and Ann Neighbors to the contrary. Ann Neighbors stated that Mrs. Barnes once told her that she was supposed to receive $7,000 for the death of her son, and that Mrs. Neighbors called to speak with G. L. Sherman and Associates about this situation. Mrs. Neighbors testified that she recounted to Mrs. Barnes that Mr. Burchinal had told her a typographical error had caused the problem. When Ann Neighbors related to Mrs. Barnes the explanation given by Mr. Burchinal, Ann Neighbors stated that Mrs. Barnes "didn't say anything, except that she understood."
The record indicates that there was very little communication between the insured and the Company concerning the matter of the discrepancy either at the instigation of the insured or the Company. For example, William Millar of Gulf Atlantic stated that he did not himself provide for Mrs. Barnes a description of how the clerical error occurred. James Beckett of Gulf Atlantic did state that he was aware of an arrangement that had been made with the G. L. Sherman and Associates staff in Pascagoula whereby it was agreed that the agency staff in Pascagoula would tell Mrs. Barnes about the change or correction in the second policy. Millar testified that he had been informed by Jim Beckett that the person who delivered the claims check to Mrs. Barnes would tell her about the clerical error. In any event, a Company witness did confirm that he was not aware of any written communication from Gulf Atlantic to Mrs. Barnes that had been made to explain the corrective process; therefore, the jury could have concluded that the Company made no direct attempt to explain to its policyholder the reason why $7,000 was not paid instead of $1,000. On the other hand, Mrs. Barnes admitted that she had not corresponded or said anything to Gulf Atlantic Insurance Company about the alleged discrepancy in the amounts of insurance from the time she negotiated the $1,000 check in November of 1978, up until the time her attorney wrote *923 Gulf Atlantic on June 7, 1979, and she filed suit against Gulf Atlantic on June 22, 1979.
At trial certain testimony was presented regarding the validity of the Barnes claim and certain settlement negotiations that transpired between the plaintiff's attorney and Gulf Atlantic. Mr. Beckett testified that he received a demand letter from plaintiff's attorney on June 12, 1979, and that Gulf Atlantic was served notice of the lawsuit on June 28, 1979. He added that Mr. Steve Rabisa of Gulf Atlantic had tried to contact plaintiff's attorney on the morning of the 28th before service was effected. After suit was filed, Mr. Beckett stated that he offered to pay $6,000 as settlement to the plaintiff's attorney, but that Mr. Owen, plaintiff's attorney, would not accept that amount. Mr. Beckett also testified that he had asked the attorney for the plaintiff which policy Mrs. Barnes wanted to keep when he spoke to plaintiff's attorney regarding the settlement offer. Mr. Beckett testified that he believed the best way to handle the Barnes situation "way back then [when suit was filed] was for a settlement in Mrs. Barnes' favor and dismissal of the suit." There was some further testimony regarding plaintiff's settlement negotiations. Mr. Beckett answered interrogatories for Gulf Atlantic to the effect that "by mistake the policy was written with $7,000 life insurance," "the company mistakenly paid the $1,000 benefit which appeared in the insurance policy," and that when Gulf Atlantic received "knowledge of the second mistake it offered to pay an additional $6,000 but such offer was declined by plaintiff's attorney."
As to the validity of the Barnes claim, William Millar stated unequivocally that the insurance policy remained in full force, that all premiums had been paid by Mrs. Barnes, that there was no question that Mrs. Barnes's son had died, and that Mrs. Barnes's son was covered by the policy. Mr. Millar stated that he believed Mrs. Barnes had a valid claim for $1,000, and that her son was insured for "whatever the amount should have been." Mr. Beckett testified that he believed the $1,000 amount that had been paid to Mrs. Barnes was "all we owe her" because no one had ever told him that Gulf Atlantic owed $6,000 more on the Barnes claim; nevertheless, Mr. Beckett admitted in his deposition that "we believe we owe $6,000 more," and his answer to plaintiff's interrogatory number 16 states that "we are ready, willing and able to pay $6,000."
The record shows that the Company's motion to dismiss plaintiff's complaint was denied by the court on September 10, 1979, that the Company's answer was filed on November 27, 1979, and contemporaneously therewith the Company asked leave of court to deposit the $6,000, plus interest ($443), in court; the court granted the request and ordered the clerk to deposit the money.
The question presented by this appeal is whether these facts presented a jury question on the tort of bad faith refusal of the insurance company to pay the proceeds of the first policy.
The Company contends that the plaintiff wholly failed to establish that it was guilty of a bad faith refusal to pay a valid claim. The insured, on the other hand, contends that there was sufficient evidence, applying the guidelines set out in recent decisions of this Court, to merit recovery for the tort of bad faith.
To determine which party's contention is correct, we believe it is desirable to restate once again the requirements, under Alabama law, for establishment of the tort of bad faith refusal to pay a valid claim. The latest pronouncement by this Court on this question was made in Chavers v. National Security Fire and Casualty Company, 405 So.2d 1 (Ala.1981), wherein a majority of this Court stated that "We recognize the intentional tort of bad faith in first party insurance actions." Other cases which involve a similar or related question are: American Road Service Co. v. Inmon, 394 So.2d 361 (Ala.1980); Vincent v. Blue Cross-Blue Shield of Alabama, Inc., 373 So.2d 1054 (Ala.1979); Old Southern Life Ins. Co. v. Woodall, 295 Ala. 235, 326 So.2d 726 (1976), appeal after remand, 348 So.2d 1377 (Ala.1977).
*924 Bad faith is the intentional failure by an insurer to perform the duty implied by law of good faith in fair dealing. Chavers v. National Security Fire and Casualty Company, supra. In Chavers the Court stated:
We next address the issue of what standard of proof an insured is required to meet in order to recover on a claim for bad faith. In so doing we adopt the test promulgated by the dissent in Vincent and hold that an actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either "(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal." [405 So.2d at 7.]
The dissent of Mr. Justice Embry in Vincent v. Blue Cross-Blue Shield of Alabama, Inc., 373 So.2d 1054, 1065 (Ala.1979), was neither expansive nor definitive of the tort of bad faith. It was not necessary then to expound on the elements comprising the tort. The time has come, however, to examine the parameters of the test for determining whether an insurer has intentionally refused to settle a first party insurance claim.
The first tier of the test promulgated by Mr. Justice Embry and adopted by this Court in Chavers establishes that the tort of bad faith refusal to honor a direct claim arises when there exists "no lawful basis for the refusal coupled with actual knowledge of that fact." "No lawful basis," as expressed in that opinion, means that the insurer lacks a legitimate or arguable reason for failing to pay the claim. See Michael v. National Security Fire & Casualty Co., 458 F.Supp. 128 (N.D.Miss.1978). That is, when the claim is not fairly debatable, refusal to pay will be bad faith and, under appropriate facts, give rise to an action for tortious refusal to honor the claim. Anderson v. Continental Insurance Co., 85 Wis.2d 675, 271 N.W.2d 368 (1978). When a claim is "fairly debatable," the insurer is entitled to debate it, whether the debate concerns a matter of fact or law. "Coupled with actual knowledge of that fact" implies conscious doing of wrong. Bad faith, then, is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty, . e., good faith and fair dealing, through some motive of self-interest or ill will.
The second tier of the test is an elaboration on the first. The trier of fact, by finding, on the part of the insurer, an "intentional failure to determine whether or not there was any lawful basis for refusal," may use that fact as an element of proof that no lawful basis for refusal ever existed. The relevant question before the trier of fact would be whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review. Implicit in that test is the conclusion that the knowledge or reckless disregard of the lack of a legitimate or reasonable basis may be inferred and imputed to an insurance company when there is a reckless indifference to facts or to proof submitted by the insured. Of course, if a lawful basis for denial actually exists, the insurer, as a matter of law, cannot be held liable in an action based upon the tort of bad faith. Otherwise, the insurer's knowledge of the non-existence of any debatable reasons for refusal would be a question for the finder of fact, i. e., the jury.
The Supreme Court of Wisconsin expressed the views which we now adopt concerning the tort of bad faith when it concluded:
We are satisfied that the application of the test formulated above, which recognizes the intentional nature of the tort of bad faith and puts the test upon an objective basis, will minimize the fears expressed by the defendant insurance company that to permit claims for bad faith will result in extortionate law suits. Such result cannot follow when an insurance company in the exercise of ordinary care makes an investigation of the facts and law and concludes on a reasonable basis that the claim is at least debatable. [Anderson v. Continental Insurance Co., *925 85 Wis.2d 675, 693, 271 N.W.2d 368, 377 (1978).]
California is the leading jurisdiction allowing tort recovery for bad faith. Fletcher v. Western National Life Insurance, 10 Cal.App.3d 376, 89 Cal.Rptr. 78 (1970); Gruenberg v. Aetna Insurance Company, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973); Silberg v. California Life Insurance Company, 11 Cal.3d 452, 113 Cal.Rptr. 711, 521 P.2d 1103 (1974). These decisions reflect the policy that an insured purchases insurance and not an unjustified court battle when he enters into the insurance contract. Furthermore, they stand for the proposition that there will not be an unlicensed recovery of punitive damages in every bad faith case.
Because the violation of the duty of good faith and fair dealing is tortious in nature, punitive damages as well as compensatory damages are recoverable in the proper case. A distinction must be drawn, however, between that conduct which gives rise to tort liability in the first instance and conduct that justifies imposition of punitive damages.
In Silberg v. California Life Insurance Company, supra, the Supreme Court of California discussed the distinction:
It does not follow that because plaintiff is entitled to compensatory damages that he is also entitled to exemplary damages. In order to justify an award of exemplary damages, the defendant must be guilty of oppression, fraud or malice. [Citing a California statute] ... While we have concluded that defendant violated its duty of good faith and fair dealing, this alone does not necessarily establish that defendant acted with the requisite intent to injure plaintiff. [Id. at 462, 113 Cal. Reptr. at 718, 521 P.2d at 1110.]
Accord, Escambia Treating Company v. Aetna Casualty & Surety Co., 421 F.Supp. 1367 (N.D.Fla.1976).
Alabama allows recovery of punitive damages when the plaintiff shows that he suffered, at least, nominal damage and that the acts complained of were committed with malice, willfulness, or wanton and reckless disregard of the rights of others. Mid-State Homes, Inc. v. Johnson, 294 Ala. 59, 311 So.2d 312 (1975); Ray Hughes Chevrolet, Inc. v. Gordon, 294 Ala. 638, 320 So.2d 652 (1975). Thus, for punitive damages to be awarded in Alabama, a defendant must not only intentionally have breached his duty of good faith, but in addition must have committed acts of the nature described above. Recoverable damages may include mental distress and economic loss. Chavers v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala.1981). And, under Alabama law, the amount of damages is left largely to the discretion of the jury; however, this discretion is not absolute. Lowe v. General Motors Corporation, 624 F.2d 1373 (5th Cir. 1980). The court may set aside or reduce a verdict which it believes is not merely overly generous, but so excessive that it demonstrates "bias, passion, prejudice, corruption or other improper motive or cause." Airheart v. Green, 267 Ala. 689, 693, 104 So.2d 687, 690 (1958).
We have set out extensively the testimony of the various witnesses to show the basis for our determination that, under the facts of this case, and applying the test adopted in Chavers, the plaintiff proved a prima facie case that the insurance company was guilty of the tort of bad faith refusal to pay a claim.
If a lawful basis for refusal had existed, the insurance company would have valiantly argued that fact. Instead, after plaintiff filed suit, the insurer offered to pay the remainder of the face value of the policy. If the trial judge had found a lawful basis, i. e., legitimate or arguable reason, for refusal, he would have directed a verdict in favor of the insurer on Count III, the wrongful, intentional and unreasonable refusal to pay. When presented with the opportunity to direct such a verdict, however, he refused to do so. Moreover, even with the value of hindsight after the conclusion of the jury trial, the trial judge continued to find no lawful basis for refusal. Otherwise, he would have granted the insurer's motion for judgment notwithstanding *926 the verdict or, in the alternative, for a new trial. After reviewing the evidence, we find that the jury could reasonably have concluded that the insurer tried to cover its "mistake" without any existing debatable reason. The policy was valid from the date of its issuance and the insurer never had any lawful basis for refusing to pay the face value.
The judgment rendered against the insurance company in the amount of $1,100,000, however, is excessive and obviously the result of passion and prejudice on the part of the jury. We, therefore, direct the trial court to require within thirty days a remittitur in the amount of $1,000,000 as a condition to the denial of a new trial. Rule 59(f), ARCP.
The Company makes several other claims as error, which we do not address in view of our holding with regard to the judgment rendered against the Company "in the sum of $1,100,000." The judgment in the sum of "$6,000 plus interest from balance due on policy from 9/4/78" is due to be affirmed.
We find sufficient evidence from which the jury could have concluded that the Company made a counter-offer which was accepted by the policyholder. Any error committed during the trial insofar as the $6,000 judgment is concerned would be harmless. Rule 45, ARAP.
We also affirm the judgment of the trial court which denied the Company's request to reform the policy. The plaintiff has now established her claim to the validity of the policy in the amount shown on the policy, which includes, of course, a lesser amount of insurance on her life than she applied for. We reach this judgment also in the interest of having the rights and obligations of the parties under the initial policy finally determined.
AFFIRMED CONDITIONALLY, AND AFFIRMED IN PART.
FAULKNER, JONES, EMBRY, SHORES and ADAMS, JJ., concur.
MADDOX, J., dissents with opinion, in which TORBERT, C. J., concurs.
ALMON, J., dissents without opinion.
MADDOX, Justice (concurring, in part; dissenting, in part).
I concur that the judgment in the sum of "$6,000 plus interest from balance due on policy from 9/4/78" is due to be affirmed, and I also agree that the judgment of the trial court which denied the insurance company's request to reform the policy is also due to be affirmed. I must disagree that plaintiff, under the undisputed facts of this case, proved a claim of bad faith refusal to pay a valid policy obligation.
There are certain undisputed facts in this case. It is undisputed that the face amount of the children's rider was different from the amount of insurance applied for on the application. It is also undisputed that the plaintiff applied for a policy which called for a children's rider of only $1,000. The evidence is also undisputed that a Company employee encoded the children's rider benefit improperly. While the jury could have found from the evidence that the issuance of the policy with a $7,000 children's rider was a counter-offer, which plaintiff accepted, nevertheless, the existence of a valid claim for the $7,000 benefit was not determined until the jury, after reviewing the evidence presented at trial, and after having been instructed on the law of contracts relative to counter-offer and acceptance of counter-offers, decided the issue in plaintiff's favor.
As I view the matter, until the judgment was entered today in favor of the policyholder on her claim that she was entitled to $7,000 instead of $1,000, and until today, when this Court upheld the trial court's denial of the company's claim that the policy should be reformed, the parties were litigating their respective rights; therefore, the Company's obligation to pay $7,000 instead of $1,000 was not finally determined until this Court affirmed the judgment of the trial court on these issues.
In order for the tort of bad faith to arise, it must be established that there was no *927 question as to the terms, conditions or obligations of the parties under the contract. Since there was a variance between the $1,000 children's rider benefit amount on the application, and the face amount of the policy, there was a justiciable controversy between the parties as to the correct amount due and owing.
Where there is a variance between the policy and the application, complex legal questions arise. It has been stated as follows:
If both the policy and the application therefor form a part of the contract of insurance, both should be given effect if a reasonable construction will permit. In case of a conflict, most cases adopt the rule that the policy, as the later and final expression of the intent of the parties, controls. There are, however, some courts which have given controlling effect to the application in such a case.
43 Am.Jur.2d Insurance, § 368 (1969).
In Alabama, I do not believe that the mere fact that a policy is issued which does not conform to the application submitted necessarily amounts to a counter-offer. Cf. Life Insurance Company of Georgia v. Miller, 292 Ala. 525, 296 So.2d 900 (1974); Barnes v. Atlantic and Pacific Life Insurance Company of America, 295 Ala. 149, 325 So.2d 143 (1975); and Liberty National Life Insurance Company v. Smith, 356 So.2d 646 (Ala.1978).
Under all the facts of this case, it is plain that a valid and subsisting dispute existed between the insured and the insurer as to the amount of insurance payable under the children's rider, and that this dispute was not finally resolved until today, when this Court affirmed the judgment entered upon a jury verdict which found in favor of the policyholder on this issue. Because of this valid and subsisting dispute, I believe that the company had a lawful basis upon which to refuse to pay the $6,000 until the matter was resolved by the parties themselves or in a court proceeding such as was filed in this case.
The majority holds:
After reviewing the evidence, we find that the jury could reasonably have concluded that the insurer tried to cover its "mistake" without any existing debatable reason. The policy was valid from the date of its issuance and the insurer never had any lawful basis for refusing to pay the face value.

The majority errs, in my opinion, in making a legal determination that there was valid policy from the time the policy was issued, under the facts of this case. As already pointed out, the question of which amount was due the policyholder was not finally determined until today. The fact that the claim to the $7,000 was being litigated, and the fact that the company was attempting to have the policy reformed, constitute a legal basis upon which the company could refuse to pay the claim.
The holding in this case, in view of the fact that the claim was in litigation, seems inconsistent with the suggestion in Chavers, 405 So.2d 1 (Ala.1981), that a company, when faced with a question of its legal obligation to pay, could file a declaratory judgment action, and if entitled to a declaration of rights, could prevent the maintenance against it of an action for bad faith refusal to pay a claim, even if the declaration was adverse to the company.
Because of these reasons, I would reverse the judgment on the bad faith claim.
TORBERT, C. J., concurs.