The issue before the Court is whether the trial court erred in refusing to grant the defendant's motion for new trial on the ground that the verdict was against the great weight and preponderance of the evidence in a suit for bad faith refusal to pay an "insurance claim." The jury found for the plaintiff and awarded damages of $16,000. We reverse and remand.
In 1977, Parker was a "crop duster" airplane pilot. Because of the hazardous nature of his occupation, he wished to purchase a hospitalization insurance policy and a term life insurance policy. D.E. Turrentine, the local agent for Independent Life Accident Insurance Company (hereinafter Independent) offered to take Parker's application for the policies. Turrentine told *Page 234 
Parker that he thought Independent would offer the same coverage offered by other insurers at a lower monthly rate. Turrentine also advised Parker that his hospitalization insurance would be less expensive if Parker took a policy with a high deductible. Turrentine advised Parker that Independent had what was termed a "cash value deposit fund" (hereinafter CVDF) whereby Parker could deposit with Independent an additional $10.00 per month that would earn a variable rate of interest and could be withdrawn at any time to pay the deductible amount on the hospitalization policy. This $10.00 could be "paid" to Independent along with the monthly policy premium.
Turrentine testified at trial that he used rate tables provided by Independent, and estimated to Parker that the monthly life insurance "premium" would be $53.85. Parker testified that Turrentine advised him that the premium and CVDF deposit together "would run somewhere in the neighborhood of $45.00 to $50.00, give or take a few dollars." After Turrentine had completed the applications, Parker gave Turrentine a check for $53.85, which was sent with the life insurance applications to Independent's home office in Jacksonville, Florida. In the remarks column of the application for life insurance, Turrentine wrote: "$10.00 Cash Value Deposit Fund with Bank Draft. $7.50 per 1,000 extra rate in premium." Turrentine also arranged for automatic monthly payments on the life insurance policy, through a draft from Parker's local checking account.
Independent approved the hospitalization and life insurance coverage on Parker and returned the policies to Turrentine, who delivered them to Parker. The third page of the life insurance policy is set out below:
 "POLICY DATA SCHEDULE
 "INSURED ELLIOTT PARKER $50,000.00 AMOUNT OF INSURANCE
 "POLICY NUMBER 77003429 May 19, 1977 DATE OF POLICY
 "AGE 31 May 19, 1997 EXPIRY DATE
 "BENEFICIARY: AS STATED IN THE APPLICATION OR
 SUBSEQUENT ENDORSEMENT
 "FORM NO. BASIC PLAN PREMIUM PREMIUM
 PERIOD
 (Years)
 "1-7111 20 Year Select $48.75 20
 Reducing Term
 "ADDITIONAL BENEFITS AND RIDERS
 "9-7123 CASH VALUE
 DEPOSIT FUND $10.00 .05 20
 "TOTAL PREMIUM $48.80
 "PREMIUM DUE DATES: Nineteenth Day of Each Month
 "The premium payable on any due date is the sum of the
 amounts then payable for the benefits listed in the Schedule
 above."

The actual amount drafted from Parker's account for the policy of life insurance was $45.10 per month. The amount was reduced by three dollars per month "because of the convenience to [Independent] of the bank draft system." The $45.10 draft included a $.05 fee for handling the CVDF. Parker received notices from Independent regarding the CVDF. Two of these notices are reproduced below:
 "CASH VALUE DEPOSIT FUND STATEMENT
 "INDEPENDENT LIFE AND DATE TRANSACTION AMOUNT BALANCE
 ACCIDENT INSURANCE CO. 05/20/80 LAST BALANCE .00 .00
 ONE INDEPENDENT DRIVE 03/01/81 RATE CHANGE .10000 .00
 JACKSONVILLE FLA
 32276
 *Page 235 
 "PARKER, ELLIOTT
 "RT 2, BOX 45-A
 "TOWN CREEK, AL
 "POLICY NUMBER ANNIVERSARY DATE STATEMENT DATE
 "77003429 05/19/81 03/10/81
 "031903"
 "CASH VALUE DEPOSIT FUND STATEMENT
 "INDEPENDENT LIFE AND ACCIDENT DATE TRANSACTION AMOUNT BALANCE
 "INSURANCE CO. 05/19/81 LAST BALANCE .00 .00
 "ONE INDEPENDENT DRIVE 10/01/81 RATE CHANGE .13500 .00
 "JACKSONVILLE FLA 11/16/81 RATE CHANGE .12500 .00
 "32276 12/21/81 RATE CHANGE .10000 .00
 03/01/82 RATE CHANGE .11500 .00
 "PARKER, ELLIOTT
 "RT 2, BOX 45-A
 "TOWN CREEK, AL 35672
 "POLICY NUMBER ANNIVERSARY DATE STATEMENT DATE
 "77003429 05/19/82 03/09/82
 "031903"

Parker admitted receiving these notices from Independent, which show that he had no balance in the CVDF. In 1981 Parker ran short of funds, and decided to withdraw the money in the CVDF. Parker's wife contacted Independent and was informed by letter on December 8, 1981, that Independent would not "honor this request as our records indicate there has not been a deposit since January of 1980. A total of $45.10 is drafted from your account each month representing payment of premium only. Therefore, there is no money in this fund."
The Parkers were next contacted by Gene Williams, the salesman who had replaced Turrentine. Williams took Parker's policy and sent it to Independent's regional office. R.L. Carter, Independent's regional office manager, checked with Independent's home office in Jacksonville and found that no money had been withdrawn from Parker's checking account for the CVDF.
David Hicks, the director of "ordinary services" at Independent's home office testified as to what had occurred in the home office. The original $53.85 collected from Parker was applied to the first premium of $45.10. This left $8.75 over and above the premium cost. This $8.75 was held and applied to the next month's premium. The amount withdrawn from Parker's checking account for the second premium was $36.35. The $8.75 was "carried over" because $10.00 was the minimum amount that Independent's system of accounts was designed to accept on CVDFs. Hicks further testified that no one at the home office had notified Parker or Turrentine of this fact. Hicks stated that because Parker would receive statements of his CVDF account balance as a matter of course, the home office decided not to contact Parker. Hicks further testified at trial about the internal procedure used by Independent and the CVDFs generally:
 "When we established the CVDF fund and enabled that to be taken out of a bank draft, the agent didn't write anything in the remarks section. We assumed if it was a bank draft that the CVDF would come out. We assumed wrong in a lot of cases and we ended up drafting people's bank accounts for more than what they wanted to come out because they wanted to set up the fund, but they didn't want us to take anything out right now, they wanted to have the liability [sic] to put it in later so it made a lot of people angry, they had a lot of bounced checks, we ended up paying a lot of bank charges that we didn't want *Page 236 
to pay, but we felt it was only right to pay the charges since there was a misunderstanding. So, we decided to come up with a way that maybe we could get it a little closer so we could understand whether they wanted it to come out with the draft or not. So we asked the agents to write in the remarks section that they want the draft to come out. Again, we ran into problems, not as many, but we still had people saying, yes, I told them that I wanted the draft to come out of my account, the CVDF to come out of my account, but I did not expect him to start taking it now. Again, we had bounced checks and again we had to pay bank charges. So, we made it an internal idea that just before issue the underwriter would call the agent to verify exactly when that first CVDF payment was to come out of that draft. In this case there is no reflection that a phone call was made. Therefore, we opted not to take the additional money out of his [Parker's] account, which would maybe have incurred bounced checks bank charges again. That's the reason for it. We felt it best for the insured, and for us, that we not take more money out than we were sure was supposed to come out of the account. [Emphasis added.]"
Parker filed suit against Independent and Turrentine, alleging intentional misrepresentation, reckless misrepresentation, conspiracy to defraud, and bad faith refusal to pay a valid claim on the part of Independent. At the close of Parker's case, the conspiracy count was dismissed by agreement of the parties. The defendants asked for a directed verdict on the remaining counts, which the trial court denied. At the close of all the evidence no motions were made by any party. The jury returned a verdict for Parker and against Independent on the bad faith count for $16,000.
Independent timely moved for a judgment notwithstanding the verdict (JNOV) or in the alternative a new trial, which the trial court denied. Independent appeals from these post-trial orders.
Independent failed to renew its motion for directed verdict at the close of all the evidence; therefore, we cannot review the claim that the court erred in not granting the JNOV. "[A] motion for directed verdict must be made at the close of all the evidence. . . . Failure to make the [directed verdict] motion at the close of all the evidence precludes the party complaining of the insufficiency of the evidence from later making a motion for JNOV." Great Atlantic and Pacific TeaCompany, Inc. v. Sealy, 374 So.2d 877, 881 (Ala. 1979); seealso Ala.R.Civ.P. 50; Casey v. Jones, 410 So.2d 5 (Ala. 1981);Rush v. Eason Plumbing Electrical Contractors, 361 So.2d 516
(Ala. 1978); 5A J. Moore, W. Taggart J. Wicker, Moore'sFederal Practice ¶ 50.05 (2d ed. 1976).
In a motion for new trial, a party may assert that the verdict is against the great weight and preponderance of the evidence, without having filed any previous motions to that effect.
The scope of review is settled: "A post-judgment motion for a new trial, grounded on a claim that `the verdict is against the great weight and preponderance of the evidence' should be granted only in extreme cases, when to let the verdict stand, though supported by some evidence, would be palpably wrong and manifestly unjust." Casey, supra, at 8; Ala.R.Civ.P. 50; seeChavers v. National Security Fire Casualty Co., 405 So.2d 1
(Ala. 1981), for a discussion of the history of the standard, especially as it is applied to an alleged bad faith refusal to pay an insurance claim.
Further, we are aware that where a trial judge has overruled a motion for a new trial, this strengthens the presumption of correctness of the jury's verdict. Casey, supra.
The law in bad faith cases is still in the formative stage. It is well established, however, that the following quote sets out some of the conditions and elements of the tort.
 "National Security Fire Casualty Co. v. Bowen, 417 So.2d 179 (Ala. 1982), is *Page 237 
our most recent effort to define the recently recognized tort of bad faith refusal to pay a valid insurance claim. There we said:
 "`An insurer is liable for its refusal to pay a direct claim when there is no lawful basis for the refusal coupled with actual knowledge of that fact. Chavers v. National Security Fire Ins. Co., Ala. 405 So.2d 1 (1981). No lawful basis "means that the insurer lacks a legitimate or arguable reason for failing to pay the claim." Gulf Atlantic Life Ins. Co. v. Barnes, Ala. 405 So.2d 916 (1981). When a claim is "fairly debatable," the insurer is entitled to debate it, whether the debate concerns a matter of fact or law. Ibid.
 "`Under those authorities the plaintiff in a "bad faith refusal" case has the burden of proving:
 "`(a) an insurance contract between the parties and a breach thereof by the defendant;
 "`(b) an intentional refusal to pay the insured's claim;
 "`(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
 "`(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
 "`(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
 "`In short, plaintiff must go beyond a mere showing of a nonpayment and prove a bad faith
nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim.
 "`The "debatable reason" under (c) above means an arguable reason, one that is open to dispute or question.'"
National Savings Life Insurance Co. v. Dutton, 419 So.2d 1357,1361 (Ala. 1982). See also Prudential Ins. Co. of America v.Coleman, 428 So.2d 593 (Ala. 1983) (rejecting any cause of action based upon an insurer's negligence in handling direct claims). The burden on a plaintiff in a bad faith case is a very heavy one. Dutton, supra.
Applying these rules to the facts of this case, we hold that the plaintiff failed to meet that burden.
Having determined that the plaintiff failed to prove a claim of bad faith refusal to pay, we must reverse and remand to the trial court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
TORBERT, C.J., and JONES, SHORES and BEATTY, JJ., concur.