461 So.2d 1320 (1984)
BLUE CROSS AND BLUE SHIELD OF ALABAMA
v.
Roy W. GRANGER, Jr.
82-959.
Supreme Court of Alabama.
December 21, 1984.
*1322 William G. Somerville, Jr., and Lawrence B. Clark of Lange, Simpson, Robinson & Somerville, Birmingham, and John Percy Oliver, II of Oliver & Sims, Dadeville, for appellant.
John F. Dillon, IV of Dillon, Kelley & Brown and Larry W. Morris of Radney & Morris, Alexander City, for appellee.
BEATTY, Justice.
Roy W. Granger, Jr., brought suit against Blue Cross and Blue Shield of Alabama (Blue Cross), alleging bad faith refusal to pay a claim. The action involved coverage under a group hospital and medical contract. Defendant Blue Cross now appeals from an adverse judgment entered on a jury verdict. We reverse and remand.
On January 4, 1981, Roy W. Granger III (Trey) and his sister Jennifer were injured in an automobile accident. They were taken to Elmore County Hospital, then transferred to Baptist Medical Center (BMC) in Montgomery. When the children were admitted to BMC, plaintiff Granger signed a form whereby he agreed to pay all medical expenses and to assign any applicable insurance benefits to BMC. The plaintiff at this time also submitted the Blue Cross identification card issued in the name of his wife, Robbie L. Granger. Mrs. Granger was a teacher covered under a group hospital and medical contract. She was listed as the subscriber, and her husband, son, and daughter were designated as dependents.
Jennifer spent several days at BMC, but Trey was treated in the emergency room and released. The cost of Jennifer's treatment was over $500. The cost of Trey's treatment totalled $282, which included a $120 fee for physician's services. Blue Cross paid claims for all of the children's medical bills from both Elmore County Hospital and BMC, except for the $120 claim for physician's services provided to Trey at BMC. This $120 claim remained unpaid for approximately a year and three months and is the sole basis of this action.
Granger filed suit against Blue Cross on March 29, 1982, alleging fraud and bad faith refusal to pay a claim. The complaint was amended to add BMC as a party defendant, and sought from BMC damages for fraud, bad faith, outrageous conduct, and abuse of legal process. Another amendment added counts of negligence and wanton misconduct against BMC. A motion for summary judgment filed by BMC was granted on all counts except those alleging negligence and wanton misconduct. The complaint was again amended to allege an additional count of invasion of *1323 privacy against BMC and to add Robbie L. Granger as a party plaintiff.
Various third party claims were filed by BMC and cross-claims were filed by both BMC and Blue Cross. These actions were dismissed prior to trial. Consequently, when the matter came on for trial, the only claims remaining were plaintiffs' claims of negligence, wanton misconduct, and invasion of privacy against BMC and fraud and bad faith against Blue Cross.
At the close of the plaintiffs' evidence, both Blue Cross and BMC moved for a directed verdict on all counts. The trial court granted BMC's motion as to the negligence and invasion of privacy counts and granted Blue Cross's motion on the fraud count. The court also granted plaintiffs' motion to remove Robbie L. Granger as a party plaintiff.
After defendant Blue Cross rested, but before defendant BMC presented its evidence, the trial court granted Granger's motion to dismiss BMC from the suit and denied Blue Cross's renewed motion for directed verdict on the bad faith count. Accordingly, the only claim submitted to the jury was the bad faith claim against Blue Cross. The jury returned a verdict in favor of Granger and assessed damages at $500,000.
The trial court entered judgment on the verdict and subsequently denied Blue Cross's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Blue Cross appeals from the final judgment and from the denial of its post-trial motions.
The facts which led to the initiation of this suit are lengthy and complicated, with the evidence on many points being contradictory. The record discloses that, after Trey was discharged, BMC submitted to Blue Cross claims for his treatment. The portion of the bill for hospital services ($162) was submitted by mail January 8, 1981, on the usual Blue Cross claim form. Blue Cross initially refused to pay this claim due to lack of information on coordination of benefits. This information was later provided and Blue Cross paid the $162 claim in April 1981.
The $120 claim for physician's services was also submitted January 8, 1981, via BMC's newly installed computerized claim billing system. This system was installed to facilitate the processing of claims, and, in effect, allows BMC to enter claims directly into the Blue Cross claim system.
Under that process, BMC first enters the claim on its computer terminal. Using a code system developed by the American Hospital Association, BMC codes in both the type of service rendered and the type of procedure performed by the physician. Other information is also provided in the claim. The BMC computer then transmits the claim by telephone line to a computer at Blue Cross's headquarters for processing. A computer printout of each claim filed is retained by BMC.
If the Blue Cross computer accepts the claim as entered and determines it to be payable under the contract, it generates a pay document for the hospital. If a claim is rejected (cannot be processed as submitted due to errors in coding) or is denied (accepted for processing but a determination is made that no coverage exists for the claim), a printed "audit trail" is sent to the hospital indicating why the claim was not paid.
Blue Cross representatives had instructed the BMC employees on the use of the computer system. January 8, 1981, the date the $120 claim was filed, was the first day BMC had filed any claims through the computer system. In submitting the claim, BMC gave a surgery code for type of service, but used a general medical examination code for type of procedure performed. Due to this inconsistency, Blue Cross's computer system was unable to process the claim. On January 9, 1981, the Blue Cross computer sent an audit trail to BMC indicating that the $120 claim for physician's services to Trey was rejected due to inconsistent coding on the claim.
When the audit trail was received at BMC, a notation was made that the claim was to be resubmitted with the proper code *1324 numbers. This was not done, however. Instead, BMC transferred the $120 bill to a "self-pay account," which meant that Granger, rather than Blue Cross, would be billed. On March 22, April 16, and May 12, BMC sent Granger a bill and/or a letter seeking payment of the $120. In response to the third letter, which stated that payment must be made within seven days, Mrs. Granger called BMC and requested that it resubmit the claim. BMC resubmitted the claim via computer on May 19, but again used inconsistent code numbers. According to a BMC employee, no response was received from Blue Cross, although it was acknowledged that some type of response is received whenever a claim is filed with Blue Cross. Records of audit trial rejections are not kept by Blue Cross.
BMC billed Granger again on May 21, two days after the computer resubmission. Bills were also sent to Granger on June 20 and July 15. Mrs. Granger went to BMC's business office on July 17 and attempted to pay the $120 bill. She was told, however, that BMC would resubmit the claim to Blue Cross. Mrs. Granger requested that she be notified before the matter was turned over to a collection agency and was assured that she would be.
BMC did not resubmit the claim or otherwise contact Blue Cross concerning the matter. BMC did, however, mail payment demand notices to Granger on July 31 and August 12. Granger did not respond to these letters, and BMC turned the account over to a collection agency on September 14, 1981.
In late August, Mrs. Granger attended a teachers' meeting at which Tim Sexton, a Blue Cross marketing representative, spoke. After the meeting, Mrs. Granger had a conversation with Sexton concerning the $120 unpaid claim. She testified that Sexton told her that if her husband had signed release forms with the automobile insurer, the $120 claim "would be taken care of." She acknowledged, however, that in her deposition she had stated that Sexton told her that "he would check into" any unpaid claims.
Sexton testified that he told Mrs. Granger he "would check into it for her." He stated that he did so and later called the Grangers to relay the information that "if a release form had been signed releasing the automobile carrier of any further liability, then the claim could be filed." (Emphasis added.) Sexton had no further communication with the Grangers until late March 1982. He stated that he was unaware until that time that the claim had not been filed or paid.
Granger continued to receive bills from BMC. In response to these bills, Mrs. Granger called BMC around the first of October and requested that it resubmit the $120 claim to Blue Cross. She testified that at about this same time, she wrote a letter to Sexton concerning the claim and gave it to her husband to mail. Mr. Granger testified that Sexton telephoned him later and said that "he received the information [Granger] had sent him and that the bill would be or had been taken care of." Sexton, however, stated that he never received this letter.
During October 1981, Granger received letters and telephone calls from the collection agency employed by BMC to pursue the account. In mid-October, Mr. Granger attempted to call Sexton about this matter. Sexton was not in the office; therefore, Granger left a message. His call was not returned.
In response to further communications from the collection agency, Mrs. Granger contacted BMC in early November 1981 and again requested that the $120 claim be resubmitted. On November 11, BMC mailed to Blue Cross a copy of the claim form for the $162 claim which had previously been paid and a photocopy of the computer printout of the May 19 resubmission of the $120 claim. No letter or note of explanation accompanied these documents. Other than this mailing and the May 19 resubmission containing incorrect codes, BMC did not, at any time after January 9, 1981, attempt to contact Blue Cross concerning this claim.
*1325 Upon receipt of the items mailed November 11, Blue Cross reviewed the $162 claim and determined that it had already been paid. The BMC computer printout of the May 19 resubmission of the $120 claim, however, was a document intended for internal use at BMC and had no meaning for Blue Cross personnel. Consequently, the printout copy was simply placed in the files of the Blue Cross claims department. Blue Cross received no further contacts concerning the $120 claim until March 1982.
Granger, meanwhile, continued to receive letters from the collection agency demanding payment. However, he did not pursue the matter with either BMC or Blue Cross. On March 18, 1982, a collection suit was filed against Granger, and he was served with the summons and complaint on March 24, 1982.
Granger testified that he immediately called Blue Cross to apprise Sexton of this turn of events. Sexton was not in, however, so Granger informed the person with whom he was speaking that he was being sued by BMC for the unpaid $120 claim. Granger stated that sometime after April 1 Blue Cross telephoned his office and informed his secretary that the claim had been paid. A default judgment was taken against Granger on April 9, 1982, due to his failure to answer the complaint.
Debbie Townes, a former Blue Cross employee, testified that she received a call on March 26, 1982, from Carol Love, Granger's secretary, who informed her that Granger was being sued by BMC. Townes obtained from Love an account number taken from one of the bills Granger had received. She then called BMC and ascertained that the $120 charge was for Trey's treatment after the accident. After obtaining permission from her department manager, Townes entered a "pickup" claim for the $120 on the $162 claim previously paid in Trey's behalf.
Each Thursday Blue Cross pays hospitals for claims filed. Townes testified that the $120 claim was entered in the claims system on Friday, March 26, 1982, and was paid to BMC on the next payroll, which was Thursday, April 1. She called Carol Love on March 29 or 30 and advised her that the $120 claim would be paid on April 1.
Tim Sexton testified that he received a call from Granger in late March 1982 concerning the unpaid $120 claim. According to Sexton, after this call, he contacted Debbie Townes and asked her to review the matter. He then called Granger back and informed him that Blue Cross was working to resolve the matter. However, Townes testified that she never talked to Sexton concerning the matter, and Blue Cross records show that Sexton called one Connie Roberts on March 25, 1982, and inquired as to the status of the claim of Granger.
The plaintiff in a bad faith case has a heavy burden of proof. As this Court set forth in National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982), the plaintiff must show:
"(a) an insurance contract between the parties and a breach thereof by the defendant;
"(b) an intentional refusal to pay the insured's claim;
"(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
"(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
"(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
"In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim. [Emphasis in original.]
"The `debatable reason' under (c) above means an arguable reason, one that is open to dispute or question. Webster's Third New International Dictionary *1326 (1931) at 116. See Chavers [v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala.1981)] at 10; see also Embry, J., concurring on rehearing in Aspinwall v. Gowens, 405 So.2d 134 (1981)."
We further commented in National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala.1982):
"[T]he tort of bad faith refusal to pay a valid insurance claim is in the embryonic stage, and the Court has not had occasion to address every issue that might arise in these cases. In Bowen, supra, we set out the elements of the tort and attempted to show the plaintiff's burden in these cases. It is a heavy burden. In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury."
Although several issues are raised by Blue Cross, the dispositive issue in this case is whether Granger met his burden of proof under Bowen and Dutton.
Initially, we note that Granger's complaint contained no allegation of breach of contract. However, a breach of contract claim of necessity underlies a claim of bad faith. See Dutton; Bowen, supra. It is the insurer's breach of the insurance contract by refusing in bad faith to pay the claim that gives rise to the tort action of bad faith. Regardless of the fact that Granger did not bring a breach of contract claim, we must, under Dutton, determine whether he would have been entitled to a directed verdict on such a claim.
To be entitled to a directed verdict on the breach of contract claim, and consequently get his bad faith claim to the jury, Granger must show that there was no debatable reason for this refusal. See National Security Fire & Casualty Co. v. Vintson, 454 So.2d 942 (Ala.1984); Dutton, supra. Section IX of the insurance contract under which the Grangers were covered provides in pertinent part:
"I. Duty of Members and Providers to Furnish Information Requested by Company

"As conditions precedent to the availability under this Contract of any coverage or benefits for any services, care, treatment, or supplies furnished or rendered to a Member:
"1. The Company must have received from or on behalf of the Member a claim or claims in writing for benefits hereunder prepared and submitted in the manner, with such information, and on such forms as the Company prescribes."
While this provision requires that claims be submitted in writing, the effective date of the contract was October 5, 1980, and the computer billing system was not installed until January of 1981. Clearly, claims submitted through the computer will not be in writing. Nevertheless, this provision would apply to computer claims to the extent that they must be "prepared and submitted in the manner, with such information ... as the Company prescribes."
Blue Cross representatives initially instructed BMC employees in the use of the computer system. As a general matter, the basic instructions for filing a computer claim must have been followed in submitting the $120 claim, for the claim was actually transmitted to the Blue Cross computer. However, both times the claim was submitted by computer (January 8 and May 19) inconsistent codings were used and therefore the claim was not "prepared and submitted in the manner" prescribed by Blue Cross. It would be ludicrous to suggest that Blue Cross instructed BMC employees to use inconsistent codings which would be rejected by the Blue Cross computer.
*1327 In denying Blue Cross's motion for directed verdict, the trial judge indicated that he felt that the fact that the claim was not properly presented was not a valid "debatable reason" and, further, stated his opinion that Blue Cross had "made [its] claim form procedure unnecessarily complex so that it could not be complied with in the context of this type case." We cannot agree with either assessment. The computer age is a fact of contemporary life. Computers are able to process more information in less time than can be processed manually. There is, however, little margin for error in entering the information.
Obviously, Blue Cross installed this computerized system in order to facilitate the processing of claims, not to complicate that process. The system, however, can only process claims which are presented in the correct manner, that is, claims which contain consistent codes. This does not appear to be a particularly complex requirement.
The $120 claim was never correctly submitted by BMC. Granted, the BMC employees were unfamiliar with the system the first time the $120 claim was submitted. By the time the claim was resubmitted, BMC employees had had some five months to familiarize themselves with this system. Even so, the repeated errors by BMC in transmitting this claim cannot be attributed to Blue Cross. In the final analysis, the claim, as submitted by BMC, could not be processed by the Blue Cross computer, and this is sufficient to show a debatable reason for Blue Cross's not paying the claim.
Moreover, this Court has made it abundantly clear that an action for bad faith lies only where the insurer has acted with an intent to injure. In Chavers v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala.1981), in which we first recognized the tort of bad faith, bad faith was defined as an action "aris[ing] for an insurer's intentional refusal to settle a direct claim." 405 So.2d at 7. (Emphasis added.) Bad faith "imports a dishonest purpose and means a breach of a known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will." Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 924 (Ala.1981). Mere negligence or bad judgment will not support a bad faith claim. Prudential Ins. Co. of America v. Coleman, 428 So.2d 593 (Ala.1983); Barnes, supra.
We find nothing in the record before us which indicates that Blue Cross acted with any intent to injure, nor do we find any evidence of malice or ill will on the part of Blue Cross. Even if the computer system was unnecessarily complex in design, that in and of itself would amount only to bad judgment or negligence and not to bad faith. An insurer which, without more, seeks to serve its insureds by computerizing its claims system should not be penalized for its efforts when, through no intentional act of the insurer, a claim runs afoul of the system.
The trial judge stated in denying Blue Cross's motion for directed verdict:
"Now, so that we address the question of the intentional aspect of the thing. I'm not saying that you [Blue Cross] were intentionally not paying the claim. I'm saying that the file reflects that you had all the necessary informationthe evidence in the case reflectsyou had all the necessary information for a period of many months but failed totally to make any investigation of any consequence. And it's on that leg, the tort of bad faith, that the court is resting its decision...."
As the trial judge recognized, there are two "legs" or prongs to a bad faith action. We stated in Chavers, 405 So.2d at 7:
"[A]n actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either `(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.'" (Emphasis added.)
It follows from this language that the plaintiff in a bad faith case may prove his case either by showing that the insurer *1328 refused to pay the claim, knowing there was no legitimate reason to refuse payment, or by showing that the insurer intentionally failed to investigate the claim to determine whether there was a legitimate reason for refusing payment.
In regard to the intentional-failure-to-investigate aspect of bad faith, this Court stated in Barnes, 405 So.2d at 924:
"The relevant question before the trier of fact would be whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review. Implicit in that test is the conclusion that the knowledge or reckless disregard of the lack of a legitimate or reasonable basis may be inferred and imputed to an insurance company when there is a reckless indifference to facts or to proof submitted by the insured...."
We find nothing in the record to support a finding that Blue Cross intentionally failed to investigate the $120 claim. The two times the claim was submitted by computer, it was lawfully rejected because it was apparent on the face of the claim, through its inconsistent codes, that the claim could not be processed. Therefore, there was no duty on Blue Cross to investigate further. Had the claim been submitted on a traditional claim form, Blue Cross would no doubt have returned it, stating that the form contained inconsistent information. The audit trail accomplished the same purpose, that is, BMC was notified that it should resubmit the claim with the correct information. Having returned the claim with an indication of the problem, Blue Cross had no duty to investigate further at that time.
Sometime prior to the time Blue Cross paid the $162 claim for Trey's treatment, Mrs. Granger made some telephone calls to Blue Cross. The evidence was in conflict as to the content of these calls. Mrs. Granger stated that she asked about the $120 claim, while Blue Cross maintained that she inquired only as to the $162 claim which had been rejected due to a lack of information on the coordination of benefits. Apparently, the calls generated additional investigation into the $162 claim or resulted in providing the needed information, because this claim was subsequently paid. If Mrs. Granger did ask Blue Cross to review the $120 claim, there is no evidence that Blue Cross intentionally failed to do so. Once again we reiterate that bad faith requires an intentional action on the part of the insurer. See Barnes; Chavers, supra. While intent can be inferred from a "reckless indifference to facts or to proof submitted by the insured," Barnes, 405 So.2d at 924, there has been no showing that Blue Cross acted with reckless indifference. The most that can be shown from the evidence presented is that Blue Cross was mistaken or negligent in investigating only the $162 claim. Neither negligence nor mistake is sufficient to show bad faith. Coleman; Barnes, supra.
These same principles apply to the Grangers' contacts with Sexton. There has been no showing of malice or ill will on the part of Sexton. By Mrs. Granger's own admission, Sexton may only have said that "he would check into" the claim. Apparently he did so and reported back to the Grangers. At most, he was negligent in not pursuing the matter further with the Grangers, but there has not been any showing of the intentional kind of action contemplated by bad faith. In granting Blue Cross's motion for directed verdict on the fraud claim, the trial court specifically found that there had been no showing of intentional fraud or fraudulent misrepresentation on the part of Blue Cross or its representatives. We agree with this finding and view it as supporting the conclusion that there was no intentional failure to investigate on the part of Sexton.
As for the items mailed by BMC on November 11, 1982, it is clear that Blue Cross regarded this as a claim for the $162 and, after investigating, determined that it had previously been paid. A Blue Cross employee testified that Blue Cross frequently receives all sorts of unidentified papers and notations attached to claims. These are routinely placed in the file with *1329 the claim. Since BMC did not send any letter of explanation with these items, it is not surprising that Blue Cross acted as it did. In fact, a BMC employee admitted that this mailing was not pursuant to normal Blue Cross procedures and would not constitute submission of the claim to Blue Cross.
This Court will not place an insurer in the position of having to investigate every unidentified and incomprehensible item it receives to determine whether it is, in fact, a claim. The responsibility lies with the insured or the entity seeking benefits on behalf of the insured (in this case BMC) to properly place the claim before the insurer. We do not mean to imply that the insurer can ignore any and every item it receives and then defend a bad faith action on the basis that it did not realize that a claim had been filed. Nevertheless, items that are intended to be claims must at least give the insurer reasonable notice that one is attempting to file a claim, so that the insurer can respond in the appropriate manner.
We conclude that Granger would not have been entitled to a directed verdict on a breach of contract claim. Not only did he fail to disprove the existence of a debatable reason for the refusal to pay the claim when it was initially submitted, but he also failed to prove any facts which would put in operation Blue Cross's duty to investigate his claim. Consequently, Blue Cross's motion for directed verdict should have been granted.
The plight of Granger arouses our concern. Certainly he was subjected to a great deal of unnecessary inconvenience and worry over the $120 claim. However, the record simply does not support a finding that he was wronged through the intentional acts of Blue Cross. It must be remembered that Granger, on his own motion, dismissed BMC from the case and proceeded solely against Blue Cross on a claim of bad faith. As we stated in Chavers, 405 So.2d at 10, "the remedy [of bad faith] will be afforded in only extreme cases." This is not such a case.
For the reasons stated above, the judgment of the Tallapoosa Circuit Court is hereby reversed and the cause remanded.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX and SHORES, JJ., concur.
JONES and ADAMS, JJ., concur specially.
FAULKNER and EMBRY, JJ., recuse themselves.
JONES, Justice (concurring specially).
This case asks the agonizing question: Can cumulative inefficiency and gross neglect in the handling of a valid claim amount to a breach of the insurer's duty to exercise good faith in the performance of its contractual obligation? Only because we have defined that duty in the strictest of terms favorable to the insurer do the facts of this case fall short of sustaining liability.
So far, this Court has upheld bad faith judgments only in extreme cases of conscious, intentional failure to process or pay valid claims. While the facts of this case do not meet that stringent standard, it is appropriate to observe that repetitive mistreatment of, and indifference to, the rights of insureds, as demonstrated here, will inevitably invite re-examination, either by this Court or by the legislature, of the claimant's burden in bad faith cases.
ADAMS, J., concurs.