621 A.2d 445

BURTON PICKETT, PLAINTIFF–RESPONDENT, v. LLOYD'S (A
SYNDICATE OF UNDERWRITING MEMBERS) AND PEER-
LESS INSURANCE AGENCY, INC., DEFENDANT–APPEL-
LANTS, AND ROBERT K. KAST ASSOCIATES, DEFENDANT.

Argued October 27, 1992—Decided March 15, 1993.

458

460

*Anthony P. Pasquarelli* argued the cause for appellants (*Methfessel & Werbel,* attorneys).

*Roger W. Thomas* argued the cause for respondent (*Dolan & Dolan,* attorneys; *F. Clifford Gibbons,* on the brief).

*David J. D'Aloia* submitted a brief on behalf of *amicus curiae,* National Association of Independent Insurers (*Saiber, Schlesinger, Satz & Goldstein,* attorneys; *Mr. D'Aloia* and *Joan M. Schwab,* on the brief).

The opinion of the Court was delivered by

O'HERN, J.

■ The question in this case is whether an insurance carrier's bad-faith failure to pay collision damage benefits to an insured over-the-road trucker for a tractor-trailer truck that was totally destroyed can be the basis of an action for damages in excess of the policy benefits for the value of the truck. We hold that our law does recognize such a cause of action when the failure to pay the policy results from a denial or a withholding of benefits for reasons that are not even debatably valid and the economic losses sustained by the policyholder are clearly within the contemplation of the insurance company.

## I

Were it not for the economic consequences to all parties, this case would be thought to arise from an almost comic mixup in the handling of an insurance claim that everyone involved has described as presenting "nothing unusual." Plaintiff, Burton Pickett, of Branchville, New Jersey lost his 1983 Mack tractor-trailer truck in a highway accident on Interstate 70 in Ohio on January 13, 1987. Another truck had stopped across the lanes of the highway, and Pickett's truck collided with it. As an "owner/operator" who had been hauling freight for Superior Carriers, Inc. (Superior) out of Kenvil, New Jersey for thirty-seven years, Pickett's seniority entitled him to "choice or refus-

al of the day's work" and thus to the more desirable and lucrative assignments. In case of an accident, Superior usually allows owner/operators a sixty-day grace period in which to replace their damaged vehicles and resume work without losing their seniority status. In Pickett's case, it extended that period for an additional thirty days—to April 13, 1987.

At the time of the accident, Pickett had a $30,000 physical-damage policy for his truck with defendant Lloyd's, an underwriting syndicate. The insurance policy had been placed by his and Superior's agent, Robert K. Kast Associates (Kast), through defendant Peerless Insurance Agency, Inc. (Peerless), an agent of Lloyd's. The policy provided in part:

> 5. PROOF OF LOSS. Within sixty (60) days after loss or damage, unless such time is extended in writing by the Underwriters, the Assured shall forward to the Underwriters a statement, signed and sworn to by the Assured, stating the place, time and cause of the loss or damage, the interest of the Assured and of all others in the property, the sound value thereof and the amount of loss or damage thereto, all encumbrances thereon and all other insurance, whether valid and collectible or not, covering said property.  * * *
>
> 6. PAYMENT OF LOSS. The loss shall in no event become payable until sixty (60) days after the verified proof of loss herein required shall have been received by the Underwriters and, if appraisal is demanded, then not until sixty (60) days after an award has been made by the appraisers.

On the day after the accident, Pickett filled out an accident report and left it with Superior, which sent it to Kast. That same day Pickett telephoned Kast and spoke with Susan Lopes, a claims executive at Kast. Lopes reported the claim to Diane Pavlick of Peerless, who faxed the claim information to Lloyd's in London on January 20. On January 21, Lopes sent Pavlick additional information regarding Pickett's claim with a cover letter that stated: "Please note the insured is out of work until his vehicle is repaired. Please expedite." Lopes said that she had never learned of Superior's seniority arrangement or that Pickett could lose his seniority.

On January 23, at Lloyd's direction, Pavlick mailed the loss information to a John Easterman in Ohio, who seems to have been a non-existent claims adjuster. The envelope was returned to Pavlick on February 4 for lack of a forwarding

address. Pickett too had tried and failed to reach Easterman using a telephone number he received from Kast. Pickett tried to tell Peerless that he had been unable to reach the adjuster, but said, "the lady that I spoke to, and I don't remember her name, was very bitter to the fact that I called her personally and she wanted to know where I got her telephone number from." Pavlick (presumably the one he had called) had no recollection of that conversation. Pickett made no further attempt to communicate with Peerless.

On February 6, Lloyd's gave Peerless new telephone numbers for Easterman. Using one of those numbers, Pavlick reached the Michigan Claims Service (Michigan Claims). Believing that Michigan Claims was either Easterman's new employer or an adjuster otherwise selected by Lloyd's, Pavlick provided it with the claim information. Not knowing that Pickett's policy was limited to physical damage, Michigan Claims unnecessarily investigated liability. A month passed before Pavlick received an adjuster's report from Michigan Claims on March 9. She forwarded the report to Lloyd's. Lloyd's telexed back on March 12, asking, "Why are Michigan Claims Service concerning themselves with liability aspect of claim? * * * Policy is physical damage not liability." Neither Pavlick nor Lloyd's had sent Michigan Claims a copy of the Lloyd's policy.

Lloyd's did approve issuance of the Proof of Loss form on March 25, agreeing to pay $29,000, the full amount of the policy less a $1,000 deductible. However, Pickett did not receive the form from Michigan Claims until April 19, six days after he had lost his seniority status. (Apparently the practice is for the adjuster, the body shop, and the insurer to negotiate the agreed amount of the loss before issuing that claim form to the insured for the signature.) Pickett signed, notarized, and returned the form the following day. The form was entitled "PROOF OF LOSS, SUBROGATION AGREEMENT, AND AUTHORIZATION TO PAY ACCOUNTS," and it contained the following release from liability:

> In consideration of such payments the said Insurance Company is hereby
> discharged and forever released from any and all further claim, demand and
> liability whatsoever for said loss or damage, under and/or by reason of said
> Policy.

Pickett said that he had "not really" read that paragraph before signing the Proof of Loss.

Michigan Claims received the Proof of Loss on April 23 and forwarded it to Peerless, which sent it to Lloyd's in London, although Pavlick could not remember when. Lloyd's received the Proof of Loss by May 14. Lloyd's waited until June 19 to send the proceeds. Michigan Claims received the check to satisfy Pickett's claim on July 2. However, the check had been made payable to Michigan Claims rather than to Pickett and the National Bank of Sussex County, the lien holder on the truck. Pavlick admitted that normally claim checks are made payable directly to the insured and lien holder. Michigan Claims had to clear the check and issue its own. The bank received its $25,000 in August 1987 and Pickett received the net proceeds of approximately $4,500 around September 15, 1987, nine months after the accident.

Pickett filed a complaint against Lloyd's, Peerless, and Kast, alleging negligent handling of his insurance claim, breach of the insurance contract, and unfair and deceptive practices. He claimed loss of income due to both the inability to operate while the claim was being processed and the loss of seniority.

After all the evidence was in, the trial court dismissed the complaint as to the broker, Kast, but denied the motions to dismiss of Lloyd's and its agent, Peerless. The jury awarded Pickett $70,000 and apportioned the negligence 60% against Peerless and 40% against Lloyd's. The jury found that Peerless had been directly responsible to Pickett for a lack of good faith and fair dealing outside of its agency relationship with Lloyd's. The court denied post-trial motions by defendants for judgment notwithstanding the verdict, new trial, and reduction of damages.

The Appellate Division affirmed the jury's award of extra-contractual damages. 252 *N.J.Super.* 477, 600 *A.*2d 148 (1991). Thus, the Appellate Division held that a first-party insured may recover in tort when an insurer breaches its duty of fair dealing. *Id.* at 490, 600 *A.*2d 148. The court rejected defendants' arguments that the measure of damages should be limited to the policy benefits under the contract, concluding instead

> that a tort action was cognizable based on Pickett's proofs that the insurer failed to act in good faith and that there was a failure of Lloyd's and Peerless to timely resolve his claim. This constituted bad faith in and of itself where Lloyd's and Peerless had notice of the urgency of the claim and the serious impact on Pickett's potential livelihood.
>
> [*Id.* at 485, 600 *A.*2d 148.]

The court also found that Pickett's claims supported an alternative cause of action in contract based on the insurance policy because his consequential damages were reasonably foreseeable at the time the policy was issued. *Id.* at 490–91, 600 *A.*2d 148. It also ruled, as did the jury, that the release provision in the Proof of Loss did not bar Pickett from recovering damages. *Id.* at 493–94, 600 *A.*2d 148. Finally, the Appellate Division upheld the damage award as reasonable. *Id.* at 494–95, 600 *A.*2d 148. We granted defendants' petitions for certification, 127 *N.J.* 563, 606 *A.*2d 373 (1992).

## II

In *Rova Farms Resort, Inc. v. Investors Insurance Co.*, 65 *N.J.* 474, 323 *A.*2d 495 (1974), this Court held that an insured may recover more than the policy limit for a liability insurer's bad-faith refusal to settle a third-party claim against its insured within that limit, when the refusal results in the third party obtaining a judgment against the insured that exceeds the policy limit. The Court emphasized that by virtue of the terms of a liability policy that prevented the insured from settling on its own behalf except at its own expense, the carrier had made itself the agent of the insured in this respect. *Id.* at 492, 323 *A.*2d 495. "Thus the relationship of the company to its insured

regarding settlement is one of inherent fiduciary obligation."
*Ibid.* (citing *Bowers v. Camden Fire Ins. Ass'n,* 51 *N.J.* 62, 237
*A.*2d 857 (1968); *Radio Taxi Serv., Inc. v. Lincoln Mut. Ins.
Co.,* 31 *N.J.* 299, 313, 157 *A.*2d 319 (1960) (Jacobs, J., dissent-
ing)). A necessary corollary of that fiduciary duty to act on
behalf of the insured is that a decision not to settle within the
policy limits

> must be an honest one. It must result from a weighing of probabilities in a fair
> manner. To be a good faith decision, it must be an honest and intelligent one in
> the light of the company's expertise in the field. Where reasonable and
> probable cause appears for rejecting a settlement offer and for defending the
> damage action, the good faith of the insurer will be vindicated.
>
> > [*Radio Taxi, supra,* 31 *N.J.* at 305 [157 *A.*2d 319] (comparing definition of
> > good faith in Uniform Sale of Goods Law, *R.S.* 46:30–1, now the Uniform
> > Commercial Code, *N.J.S.A.* 12A:1–101 to :10–106, which defines good faith to
> > mean "honesty in fact in the conduct or transaction concerned." *N.J.S.A.*
> > 12A:1–201(19)).]

This case involves what is called a "first-party" claim against
an insurance company:

> "a suit by an insured against his insurance company because of its failure to
> settle *his* claim," *Indus. Fire & Casualty Ins. Co. v. Romer,* 432 *So.*2d 66, 69
> (Fla.Dist.Ct.App.1983) (Hurley, J., concurring) (emphasis in original), as opposed
> to a suit based on the insurer's failure to settle a *third party* tort claim for a
> reasonable sum. *Id.*
>
> > [*T.D.S. Inc. v. Shelby Mut. Ins. Co.,* 760 *F.*2d 1520, 1526–27 n. 3 (11th
> > Cir.1985).]

The question in this case is whether recognizing a cause of
action for bad-faith failure to pay an insured's first-party claim
is consistent with the principles and policies of New Jersey
insurance law. The sub-parts to that question really are: (1)
does the law impose on an insurer the duty to act in good faith
in paying claims to its insured?; (2) what should be the remedy,
if any, for breach of that obligation?; (3) what is the definition
of bad faith?; and (4) what is the measure of damages to be
awarded for a breach?

## (1)

> Is there a duty on the part of an insurance carrier to exercise good faith in
> processing an insured's claims?

We are satisfied that there is a sufficient basis in law to find that an insurance company owes a duty of good faith to its insured in processing a first-party claim. We begin by noting that every contract imposes on each party the duty of good faith and fair dealing in its performance and its enforcement. In New Jersey, we have stated that obligation to be an implied term of every contract. *Onderdonk v. Presbyterian Homes*, 85 *N.J.* 171, 182, 425 *A.*2d 1057 (1981); *Bak–A–Lum Corp. v. Alcoa Bldg. Prods., Inc.*, 69 *N.J.* 123, 129–30, 351 *A.*2d 349 (1976); *Palisades Properties, Inc. v. Brunetti*, 44 *N.J.* 117, 130, 207 *A.*2d 522 (1965). *Rova Farms* itself emphasized that "principles of equity, fair dealing and good faith * * * breathed new lifegiving honesty into the bare contractual relationship sometimes mentioned as existing between insured and insurer." 65 *N.J.* at 491, 323 *A.*2d 495 (citing *McDonald v. Royal Indem. Ins. Co.*, 109 *N.J.L.* 308, 162 *A.* 620 (E. & A.1932)). Agents of an insurance company are obligated to "exercise good faith and reasonable skill in advising insureds." *Weinisch v. Sawyer*, 123 *N.J.* 333, 340, 587 *A.*2d 615 (1991). Implicit in that holding that the agent of the insurer owes a fiduciary duty to the insured is that the principal owes an equal duty. *See also Sobotor v. Prudential Property & Casualty Ins. Co.*, 200 *N.J.Super.* 333, 337–41, 491 *A.*2d 737 (App.Div.1984) (finding that relationship of insured and insurer, either agent or broker, is fiduciary one, carrying with it affirmative duties toward the insured); *Sandler v. Lawn–A–Mat Chem. & Equip. Corp.*, 141 *N.J.Super.* 437, 450–51, 358 *A.*2d 805 (App.Div.), *certif. denied*, 71 *N.J.* 503, 366 *A.*2d 658 (1976) (stating that insurer owes insured special duty of good faith and fair dealing).

Moreover, the New Jersey Legislature has defined the relationship between insurance companies and insureds by promulgating a broad range of statutory provisions. For example, *N.J.S.A.* 17:29B–1 to –14 regulates the insurance trade by defining and prohibiting unfair practices, among them, "Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reason-

ably clear." *N.J.S.A.* 17:29B–4(9)(f); *see also N.J.S.A.* 17B:30–13.1(f) (regulating life and health insurance industries with identical provision).

At least forty-five states, including New Jersey, have adopted versions of model legislation proposed by the National Association of Insurance Commissioners concerning unfair competition and unfair and deceptive trade practices. Diana C. White, *Liability Insurers and Third–Party Claimants: The Limits of Duty*, 48 *U.Chi.L.Rev.* 125, 146 n. 75 (1981). Under the legislation, the Commissioner of Insurance has the power to adopt regulations, to investigate violations of the duty of good faith and fair dealing, and to impose sanctions therefor. Among the regulations adopted is *N.J.A.C.* 11:3–10.5, which requires that automobile physical-damage claims be settled within "30 calendar days" assuming no clear justification for a delay exists.

Although the regulatory framework does not create a private cause of action, it does declare state policy and we do not think that finding a cause of action for the breach of the duty of good faith and fair dealing would conflict with that policy.

(2)

Should there be a remedy for an insurer's bad-faith refusal to pay first-party claims or benefits under a policy of insurance?

■ Many jurisdictions have declined to recognize such a cause of action on the grounds that the remedy for an insurer's failure to pay should be limited to the amount due under the policy or that the plaintiff failed to present a tort cause of action that alone would support a claim for extra-contractual damages. *Renfroe v. Preferred Risk Mut. Ins. Co.*, 296 *F.Supp.* 1137 (N.D.Okla.1969) (declining to award damages for insurer's alleged willful refusal to pay claim because Oklahoma law limits plaintiff's remedy to amount due under policy); *Industrial Fire & Casualty Ins. Co. v. Romer*, 432 *So.*2d 66 (Fla.Ct.App.1983) (an insurer's bad-faith refusal to pay claim gives rise to cause of action only if facts of refusal amount to

independent tort); *Haas v. Pacific Mut. Life Ins. Co.*, 70 *Ohio App.* 332, 41 *N.E.*2d 263 (1941) (declining to award incidental damages to plaintiff and viewing claim simply as contract-enforcement action); *Gross v. Connecticut Gen. Life Ins. Co.*, 390 *S.W.*2d 388 (Tex.Ct.App.1965) (declining to award special or exemplary damages for insurer's failure to pay because damages not covered by policy). Some courts also recognize that to permit an insured to maintain a first-party claim for bad faith against its insurer could lead to the prosecution of questionable or extortionate lawsuits. *See T.D.S. Inc., supra*, 760 *F.*2d at 1548–49 (Tjoflat, J., dissenting).

Many other jurisdictions, however, have recognized the cause of action. *Gruenberg v. Aetna Ins. Co.*, 9 *Cal.*3d 566, 108 *Cal.Rptr.* 480, 510 *P.*2d 1032 (1973); *Bibeault v. Hanover Ins. Co.*, 417 *A.*2d 313 (R.I.1980); *Nichols v. State Farm Mut. Auto Ins. Co.*, 279 *S.C.* 336, 306 *S.E.*2d 616 (1983); *Anderson v. Continental Ins. Co.*, 85 *Wis.*2d 675, 271 *N.W.*2d 368 (1978); A.S. Klein, Annotation, *Insurer's Liability for Consequential or Punitive Damages for Wrongful Delay or Refusal to Make Payments Due Under Contracts*, 47 *A.L.R.*3d 314 (1992). The *Nichols* court found that at least 25 states have adopted a cause of action for bad faith in an insurer's handling of a claim for first-party benefits. *Nichols, supra*, 306 *S.E.*2d at 618. Most jurisdictions have characterized a cause of action for bad-faith failure to pay an insured's claim as a tort that arises out of the implied duty of an insurance company to deal fairly and act in good faith in processing the claims of its policyholder. A familiar articulation of the principle is in one of the leading cases, *Anderson, supra*, 271 *N.W.*2d 368, in which Justice Heffernan described "tortious breach of contract" as "a convenient shorthand method of denominating the intentional conduct of a contracting party when it acts in bad faith to avoid its contract obligations." *Id.* at 374. We need not debate which is more appropriate: to consider the bad-faith refusal as a breach of an implied term of the contract or as an independent tort. The theoretical formulations add not to our understanding:

"[I]f the cause of action arises from a breach of a promise set forth in the contract, the action is *ex contractu,* but if it arises *from a breach of duty growing out of the contract* it is *ex delicto." Heyer v. Flaig,* 70 *Cal.*2d 223, 74 *Cal.Rptr.* 225, 449 *P.*2d 161, 164 (1969). Does this mean that if one building contractor promised to perform the work in a professional manner and another did not that the first contractor would be sued in contract for any shoddy work and the second contractor would be sued in tort? We think not; the law would imply in the latter case a promise to perform in a professional manner. Should not the law equally imply here a promise by the insurer to perform the contract, that is to pay the benefits, in a diligent and efficient manner? The demands of formalism do not require that we make a tort out of what is really an unfulfilled promise. *See* Grant Gilmore, *Death of Contract* 102 (1974) (discussing relationship between doctrines of tort and contract).

█ We thus believe that to recognize a cause of action for bad-faith failure to pay an insured's claim is consistent with New Jersey law. Compensation should not be dependent on what label we place on an action but rather on the nature of the injury inflicted on the plaintiff and the remedies requested. An insurance company's breach of the fiduciary obligation imposed by virtue of its policy, by its wrongful failure to settle, "sounds in both tort and contract." *Rova Farms, supra,* 65 *N.J.* at 504, 323 *A.*2d 495. In *Weinisch v. Sawyer, supra,* 123 *N.J.* 333, 587 *A.*2d 615, in the context of an agent's breach of duty of care, we said:

Although the allegation of an agent's breach of a duty of care carries tort overtones, the contractual relationship between insured and insurer dominates not only the relationship between them, but also that between the insured and the agent.

[*Id.* at 342, 587 *A.*2d 615.]

Accordingly, the cause of action is best understood as one that sounds in contract. And on the score of whether we should recognize a remedy for the wrong, we realize that legislation has been proposed to provide such a remedy, but has not yet

passed. *See A.* 1279, 205th Leg., First Annual Sess. (1992) (permitting first-party claim against insurer and contemplating punitive and consequential damages, in addition to recovery of policy benefits). Generally, we have held that absent forthcoming remedies from our coordinate branches of government, justice would be better served were a court of law to fashion a remedy in a particular case, and perhaps be corrected by the Legislature, than were innocent victims to have no redress at all. *E.g., Kelly v. Gwinnell,* 96 *N.J.* 538, 552–56, 476 *A.*2d 1219 (1984). "[T]he difficulties of adjudication [should not] frustrate the principle that there be a remedy for every substantial wrong." *Dillon v. Legg,* 68 *Cal.*2d 728, 69 *Cal.Rptr.* 72, 79, 441 *P.*2d 912, 919 (1968); *see also People Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 *N.J.* 246, 254, 495 *A.*2d 107 (1985) ("[T]he challenge is to fashion a rule that limits liability but permits adjudication of meritorious claims. The asserted inability to fix chrystalline [sic] formulae for recovery on the differing facts of future cases simply does not justify the wholesale rejection of recovery in all cases."). We believe here that for the Court to sidestep the question of whether a remedy should be awarded would be unwise, and will recognize a remedy for bad-faith refusal.

The trial court best articulated the rationale for such a remedy in its rhetorical question to the insurance companies:

> You mean that even if this had taken years that Lloyds [sic] hadn't paid[.] * * * [I]f you weren't paid in January, February, March, * * * and you weren't paid in 1987, you weren't paid in 1988, you weren't paid in 1989; you mean that none of that would make any difference? That you folks don't have to pay until you get around to paying; and that the only remedy would be for loss of interest? That doesn't seem to be fair.

In *Polito v. Continental Casualty Co.,* 689 *F.*2d 457, 461 (3d Cir.1982), Judge Gibbons recognized the same potential for unfairness: "[I]f liability is limited to the amount of the loss plus interest, [insurance companies] are encouraged to take advantage of the insured by delaying payments * * *." He thus wrote that New Jersey law

would recognize that casualty insurers undertake an implied contractual duty, as fiduciaries to parties with whom they have a contractual relationship, to act in good faith and to deal fairly in the settlement of claims, and that such an implied contractual duty supports a claim for consequential damages.

[*Id.* at 463.]

### (3)

What is the scope of that duty or what constitutes a bad-faith refusal to pay?

Pennsylvania has enacted a statute that permits courts to impose liability upon insurers for a bad-faith refusal to pay benefits under a policy. 42 *Pa.Cons.Stat.Ann.* § 8371 (1992). The Pennsylvania act did not define bad faith, and insurers challenged the act, claiming it was unconstitutionally vague. See *Coyne v. Allstate Ins. Co.,* 771 *F.Supp.* 673 (E.D.Pa.1991). The court had little difficulty in giving content to the concept of bad faith on the part of the insurer:

"any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. * * * [S]uch conduct imports a dishonest purpose and means a breach of a known duty (*i.e.,* good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith."

[*Id.* at 677 (quoting *Black's Law Dictionary* 139 (6th ed. 1990)).]

The foregoing discussion of *Coyne* reveals a subjective approach to the definition of bad faith. *See also Southeast Nursing Home, Inc. v. St. Paul Fire & Marine Ins. Co.,* 750 *F.*2d 1531, 1538 (11th Cir.1985) (" 'Bad faith, then, is not simply bad judgment or negligence, but ... imports a dishonest purpose.' ") (quoting *Gulf Atl. Life Ins. Co. v. Barnes,* 405 *So.*2d 916, 924 (Ala.1981)).

At the other end of the spectrum is a definition of bad faith that would equate with simple negligence. Under California law, bad faith does not equal positive misconduct of a malicious or immoral nature; it simply means the insurer acted tortiously. *Lunsford v. American Guar. & Liab. Ins. Co.,* 775 *F.Supp.* 1574, 1583 (N.D.Cal.1991). And in Idaho "an inference of bad faith can almost always be suggested by the merest of showing that the insurer's conclusions * * * are or may be

incorrect or that the insured's investigation was not complete in all details." *State Farm Fire & Casualty Co. v. Trumble*, 663 *F.Supp.* 317, 321 (D.Idaho 1987).

■ We are satisfied that neither of those end-of-spectrum definitions adequately serves the public interest. We believe that the most balanced approach is that taken by the Rhode Island Supreme Court and followed by many jurisdictions. "If a claim is 'fairly debatable,' no liability in tort will arise." *Bibeault, supra*, 417 *A.*2d at 319. The court continued:

"To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. It is apparent, then, that the tort of bad faith is an intentional one. * * * implicit in that test is our conclusion that the knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless * * * indifference to facts or to proofs submitted by the insured."

[*Ibid.* (quoting *Anderson, supra*, 271 *N.W.*2d at 376–77).]

Perhaps that rule is easiest to understand in the context of the denial of benefits on the basis of noncoverage, such as for experimental surgery under a medical-insurance policy. Under the "fairly debatable" standard, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim. *See Chester v. State Farm Ins. Co.*, 117 *Idaho* 538, 789 *P.*2d 534, 537 (1990) (finding that because dispute over replacement cost versus actual cash value was "fairly debatable," insurer could not be deemed in bad faith for refusing to pay until issue was adjudicated); *Aetna Casualty & Sur. Co. v. Superior Court*, 161 *Ariz.* 437, 778 *P.*2d 1333, 1336 (1989) (finding that two courts' agreement that plaintiff was not covered by policy demonstrated that insurance company had reasonable basis for denying claim).

A more difficult application of the standard arises when the issue involves not a denial or refusal to pay a claim but, as here, inattention to payment of a valid, uncontested claim.

Nevertheless, the test appears to be essentially the same. Albeit in the context of a worker's compensation claim, the Supreme Court of Colorado held that in the first-party context an insurer acts in bad faith in delaying the processing of a valid claim when: (1) the insurer's conduct is unreasonable, and (2) the insurer knows that the conduct is unreasonable or recklessly disregards the fact that the conduct is unreasonable. *Travelers Ins. Co. v. Savio*, 706 *P.*2d 1258, 1275 (1985). Thus, for example, when a claim is lost in the computer, those processing the claim "should not be penalized for [their] efforts when, through no intentional act[,] * * * a claim runs afoul of the system. * * * Neither negligence nor mistake is sufficient to show bad faith." *Blue Cross & Blue Shield v. Granger*, 461 *So.*2d 1320, 1327–28 (Ala.1984); *see also Coleman v. Gulf Life Ins. Co.*, 514 *So.*2d 944, 947 (Ala.1987) (applying reasoning of *Granger, supra,* to find plaintiff's claim of bad faith in processing claim unsupported by mere allegations of delay, absent showing of wrongful intent on part of insurer); *Chester, supra,* 789 *P.*2d at 537 (affirming jury's finding of insurer's bad-faith delay in paying undisputed claims where expert testimony showed that insurer's submission of Chester to "prolonged and confusing process" of filling out forms could have been tactic used by insurer to " 'starve out' " Chester).

(4)

What damages should be awarded for an insurer's bad-faith toward its insured in the payment of a first-party claim?

▮▮▮▮ Because we view the cause of action as sounding more in contract than in tort, we believe that the familiar principles of contract law will suffice to measure the damages. Under contract law, a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract. *Donovan v. Bachstadt*, 91 *N.J.* 434, 444–45, 453 *A.*2d 160 (1982). " 'Compensatory damages are designed 'to put the injured party in as good a position as he would have had if performance had been rendered as promised.' 5 Corbin, *Contracts* § 992, p. 5 (1951).' " *Id.* at 444, 453 *A.*2d 160

(quoting *525 Main Street Corp. v. Eagle Roofing Co.*, 34 *N.J.* 251, 254, 168 *A.*2d 33 (1961)). Implicit in these principles is some notion of foreseeability. Although not perfectly analogous, our doctrines allowing recovery for purely economic losses occasioned by tort offer some guidance: "[D]uty is clearly defined by knowledge of the risk of harm or the reasonable apprehension of that risk." *People Express, supra,* 100 *N.J.* at 262, 495 *A.*2d 107. Applying the definition, we ask, did the defendants know or should they have reasonably foreseen that the insureds were "at risk" of economic loss in addition to the policy benefits and that "ascertainable economic damages would ensue from the conduct" of the carrier? *Ibid.* Defendants argue that only the damages foreseeable at the time of the making of the insurance contract should be recoverable. *Donovan, supra,* 91 *N.J.* at 444, 453 *A.*2d 160. They suggest that they would have charged a higher premium for any further risk. It is as though an insurance company would ask a policyholder to pay an extra premium to cover the risk that the insurance company would not pay the benefits when due.

■ That the cause of action we now recognize will not of itself sustain a claim for negligent infliction of emotional harm suffered by an insured follows from our analysis. To sustain a claim for negligent infliction of emotional harm under our law, much more must be shown. *Portee v. Jaffee,* 84 *N.J.* 88, 101, 417 *A.*2d 521 (1980). At the same time, carriers are not insulated from liability for independent torts in the conduct of their business. For example, "[d]eliberate, overt and dishonest dealings," insult and personal abuse constitute torts entirely distinct from the bad-faith claim. *Farr v. Transamerica Occidental Life Ins. Co.,* 145 *Ariz.* 1, 699 *P.*2d 376, 383–84 (1984). Really intolerable conduct that is outrageous in character, such as threats by the insurer's agents to kill the insured and the insured's children, would undoubtedly sustain such an independent cause of action. *See National Sec. Fire & Casualty Co. v. Bowen,* 447 *So.*2d 133, 137 (Ala.1983). And finally, in order

to sustain a claim for punitive damages, a plaintiff would have to show something other than a breach of the good-faith obligation as we have defined it. *See Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 *N.J.* 37, 49–50, 477 *A.*2d 1224 (1984) (finding that defendant's conduct must be wantonly reckless or malicious; wrongfulness of defendant's intentional act is critical).

Our concept of the cause of action for an insurance company's bad-faith refusal or delay of payment of a first-party claim is consistent with New Jersey case law as it has developed. We agree with those courts that have held that absent egregious circumstances, no right to recover for emotional distress or punitive damages exists for an insurer's allegedly wrongful refusal to pay a first-party claim. *See, e.g., Ellmex Constr. Co. v. Republic Ins. Co.,* 202 *N.J.Super.* 195, 205–08, 494 *A.*2d 339 (App.Div.1985), *certif. denied,* 103 *N.J.* 453, 511 *A.*2d 639 (1986); *Garden State Community Hosp. v. Watson,* 191 *N.J.Super.* 225, 226–27, 465 *A.*2d 1225 (App.Div.1982). We also concur with the courts holding, in the highly-regulated area of personal injury protection, *see N.J.S.A.* 39:6A–5, that wrongful failure to pay benefits, wrongful withholding of benefits or other violation of the statute does not thereby give rise to a claim for punitive damages. *See, e.g., Pierzga v. Ohio Casualty Group,* 208 *N.J.Super.* 40, 504 *A.*2d 1200 (App.Div.), *certif. denied,* 104 *N.J.* 399, 517 *A.*2d 402 (1986); *Kubiak v. Allstate Ins. Co.,* 198 *N.J.Super.* 115, 486 *A.*2d 879 (App.Div. 1984), *certif. denied,* 101 *N.J.* 290, 501 *A.*2d 952 (1985); *Milcarek v. Nationwide Ins. Co.,* 190 *N.J.Super.* 358, 463 *A.*2d 950 (App.Div.1983); *but see Carfagno v. Aetna Casualty & Sur. Co.,* 770 *F.Supp.* 245 (D.N.J.1991) (refusing to recognize cause of action for either consequential or punitive damages for insurer's allegedly wrongful refusal to pay benefits based on *Ellmex, Watson, Pierzga, Kubiak,* and *Milcarek*); *Wine Imports, Inc. v. Northbrook Property & Casualty Ins. Co.,* 708 *F.Supp.* 105 (D.N.J.1989) (same). Obviously, such rulings do not grant a license to commit torts. Clearly cases may arise in

which the insurance company's conduct in response to an insured's claim for payment constitutes an independent tort. *See Farr, supra,* 699 *P.*2d at 383–84; *Bowen, supra,* 447 *So.*2d at 137.

### III

We now turn to the application of the foregoing principles to this case. We begin by noting that the circumstances of this case were different from those in the usual case. Four parties were involved in the processing of the claim: Kast (the insurance agent for Pickett and his employer), Peerless (the agent of Lloyd's in the United States), Lloyd's (the off-shore insurer), and Michigan Claims (the adjuster). Michigan Claims was not brought into the case as a party but the jury was permitted to view it as an agent of Peerless and Lloyd's. Kast was let out of the case, as noted, after all of the evidence was in on the basis that no breach of duty on its part had been shown. The trial court found that neither *N.J.S.A.* 17:29B–1 to –14, which regulates insurance industry trade practices, nor *N.J.A.C.* 11:3–10.5, which requires that automobile physical-damage claims be settled within 30 days, applied to a party in Kast's status. It found insufficient other evidence of breach of a duty of care in the absence of any expert testimony that would permit the jury to find such a duty.

Because the Lloyd's policy designated Peerless as its agent, the court ruled that Peerless shared Lloyd's duty, at a minimum, to comply with the standards set forth in the policy to pay the benefits within sixty days of submission of a Proof of Loss or the standards set forth in *N.J.A.C.* 11:3–10.5. As noted, the jury found that Peerless had been independently at fault in the matter. We see no need to charge the jury in separate terms of tort or contract in the differing disputes. In each case Peerless' duty arose from its relationship with the policyholder, not, as in most torts, from a duty to a stranger.

In charging the jury, the court did not articulate the standard precisely as we have but sufficiently conveyed its essence. The court charged the jury:

> Mr. Pickett's claim for damages in this lawsuit is based upon his allegation that the defendants negligently failed to carry out their duty to act fairly and in good faith in order to settle his property insurance damage claim in a reasonably prompt manner. * * *
>
> Both defendants * * * contend that Mr. Pickett has failed to prove that they acted unfairly or in bad faith.

The defendants' efforts to extricate themselves from the situation may have been counterproductive. Lloyd's disclaimed responsibility because of its remoteness, suggesting the problem to be

> what goes on in this country with other people? Mr. Pickett goes to Kast and he gets stonewalled. Mr. Pickett tries to call Peerless and he gets stonewalled. Mr. Pickett tries to call Michigan Claims and he gets more than stonewalled there. Probably gets told he could have the salvage when he couldn't have it. He gets told the exact opposite of what is true.

No one, however, could escape the reality, as one counsel put it, that "Mr. Pickett is an extremely nice man. * * * Did nothing wrong to anybody in this case." Yet, his claim was met with an inescapable aura of bureaucratic indifference. Pickett had been repeatedly assured by Kast, from as early as March 1987, that for all practical purposes the check was in the mail. When he attempted to communicate with Peerless he was rebuked by its employee, who asked him where he had obtained her phone number. Is it realistic to require him to call London? When the trial court denied the defendants' motions to dismiss, it particularly emphasized Peerless' unwillingness to communicate with Pickett when he called. No one ever offered any real explanation of how Michigan Claims even got into the case.

We are satisfied that the proofs here met the standard that we have established, *i.e.,* not mere mishandling of an account but rather knowledge that no reason existed to deny payment of an account and what could to the jury have appeared to be indifference to payment of the account. The case is very similar to *Chester, supra,* 789 *P.*2d 534. In that case, the court concluded that the jury could have found that the insurer

unreasonably and intentionally had delayed payment on undisputed claims. *Id.* at 537. Among the evidence contributing to that conclusion was an eight-month delay in the insurer's offer to settle with Chester for an undisputed sum; the insurer's failure to supervise its adjuster's handling of the case, which led to a delay in processing forms; and a passage of months during which Chester's file remained virtually inactive. *Ibid.*

The damages are a much closer question, but we are inclined to yield to the trial court's view of the issue. Initially, we pause to comment on the effectiveness of the release executed by Pickett. In the unusual circumstances of this case in which the release not only predated much of the long delay, but also was a condition to Pickett's receipt of any policy payment, we agree with the Appellate Division that Pickett's execution of the release did not preclude him from recovering damages.

To describe plaintiff's damage claim as lacking in specificity would be charitable. Pickett alleged that he became indebted as a result of his period of unemployment. He took out a series of short-term loans to meet ongoing business-related expenses, and withdrew $44,092 from his Keogh and IRA plans, a sum that exceeded his yearly net income. Although Pickett testified that he had withdrawn that money to meet expenses incurred from the loss of his truck, he was unable to account for how approximately half that sum had been spent. Finally, Pickett claimed that Kast and Michigan Claims had reneged on their promise to give him the right to purchase the salvage from his truck.

To avoid losing his seniority, Pickett had attempted to obtain a bank loan to purchase a substitute tractor. The bank was unwilling to advance the loan while the previous loan remained outstanding. (Pickett admitted that he did not consider leasing a truck.) In May 1987, Superior had an opening for a company driver, and Pickett took the job, earning approximately $6,000 less per year than he had as an owner/operator. We believe

that a loss of income attributable to the loss of Pickett's truck during the time of delayed payment was fairly within the contemplation of Lloyd's when it entered the contract. *See Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, 129 *N.J.* 479, 610 *A.*2d 364 (1992) (allowing lost profits as damages attributable to delay in performing construction contract). In addition, Lopes had specifically informed the insurer's agent, Peerless, as of January 1987 that Pickett was out of work until his truck was repaired. Lloyd's could reasonably have apprehended that a truck driver in this situation might lose an economic advantage such as his seniority entitlement.

Defendants also attack the jury verdict of $70,000 as having no basis in the evidence. They argue that because the parties had *stipulated* that Pickett's *average* yearly earnings in the years before the accident had been approximately $25,000 and his earnings after the accident $19,000, he could have lost only approximately $6,000 per year, the net difference. Pickett was sixty-one years old at the time of the accident, and he testified that he had intended to work for four-and-a-half years more as an owner/operator. Thus, Pickett's loss of seniority had resulted in an approximately $27,000 loss of income.

Defendants believe that the damage award was based on the jury's addition of the $27,000 due to Pickett's loss of seniority and the $44,092 sum he had withdrawn from retirement accounts. As noted, Pickett could account for only approximately half of that money. Defendants assert that his business expenses were non-existent after the accident because he no longer had the responsibility to maintain his own truck. And whether or not he had been in an accident, he still would have had to spend some money on living expenses. Thus, defendants conclude that the award was unreasonable, the result of the jurors' response to a sympathetic plaintiff.

But the trial court pointed out that the jury might well have reached the $70,000 figure another way; for example, by calculating that on the basis of Pickett's past years' income he was

capable of earning $36,000 net per year and that he had been reduced to $19,000 per year, thus justifying a $70,000 award for the four-and-one-half years of diminished earnings that he claimed. We believe that the trial court was indeed closer to the case and better able to assess the reasonableness of the jury's award of damages.

## IV

To recapitulate, an insurance company may be liable to a policyholder for bad faith in the context of paying benefits under a policy. The scope of that duty is not to be equated with simple negligence. In the case of denial of benefits, bad faith is established by showing that no debatable reasons existed for denial of the benefits. In the case of processing delay, bad faith is established by showing that no valid reasons existed to delay processing the claim and the insurance company knew or recklessly disregarded the fact that no valid reasons supported the delay. In either case (denial or delay), liability may be imposed for consequential economic losses that are fairly within the contemplation of the insurance company. In future cases, courts should carefully scrutinize the proofs of extra-contractual damages to insure that juries are not given potentially misleading items of evidence, such as Pickett's withdrawal from pension funds. These withdrawals may have been used for unrelated needs, such as house repairs. Such withdrawals should only be admissible to the extent that they are connected with the provable losses that were fairly within the contemplation of the insurance company when it made its breach of good faith in processing the claim.

The judgment of the Appellate Division is affirmed.

*For Affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI, O'HERN and STEIN—7.

*Opposed*—None.