**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1212
_____

ARCELORMITTAL PLATE, LLC,

Appellant

v.

JOULE TECHNICAL SERVICES, INC., D/B/A Joule Industrial Contractors, Inc.,
D/B/A Joule, Inc.;
LIBERTY SURPLUS INSURANCE CORPORATION;
GENATT ASSOCIATES, INC.
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-11-cv-06873)
District Judge: Honorable Berle M. Schiller

_____

Argued December 17, 2013

Before: JORDAN, VANASKIE and VAN ANTWERPEN, *Circuit Judges*

(Filed: February 18, 2014)

Richard J. Gray, Esq.
Barry Levenstam, Esq.
John H. Mathias, Jr., Esq.  [ARGUED]
Jenner & Block
353 North Clark Street
Chicago, IL 60654
        *Counsel for Appellant*

John J. Haggerty, Esq.
Nicholas S. Salter, Esq.
Fox Rothschild
2700 Kelly Road
Suite 300
Warrington, PA 18976
        *Counsel for Appellant*


Patrick C. Lamb, Esq.  [ARGUED]
Zachary R. Magid, Esq.
Marks, O'Neill, O'Brien, Doherty & Kelly
1800 John F. Kennedy Boulevard
Suite 1900
Philadelphia, PA 19103
        *Counsel for Appellee Joulé Technical Services, Inc.*

Jay B. Harris, Esq.  [ARGUED]
Hema P. Mehta, Esq.
Fineman, Krekstein & Harris
1735 Market Street
Mellon Bank Center, Suite 600
Philadelphia, PA 19103
        *Counsel for Appellee Liberty Surplus Insurance Corporation*

Andrew S. George, Esq.
Mogel, Speidel, Bobb & Kershner
520 Walnut Street
P.O. Box 8581
Reading, PA 19603
        *Counsel for Appellee Genatt Associates, Inc.*

John McGovern, Esq.
2nd Floor
221 Washington Street
Newark, NJ 07102
        *Counsel for Appellee Genatt Associates, Inc.*

_____

OPINION OF THE COURT
_____

VANASKIE, *Circuit Judge.*

The appeal before this Court arises out of cross-motions for summary judgment by Appellant ArcelorMittal Plate, LLC ("AMP") and Appellees, Joulé Technical Services, Inc., Liberty Surplus Insurance Corporation, and Genatt Associates, Inc., regarding coverage as an "additional insured" under an insurance agreement entered into by the parties. The main question presented is whether the policy's "employee exclusion" bars AMP's claim for coverage as to a lawsuit brought by an employee of Joulé, a different insured on the same policy. The District Court found that the employee exclusion did indeed bar AMP's claim for coverage, and also granted summary judgment on AMP's claim against Liberty for breach of contract and bad faith refusal to defend and indemnify, as well as AMP's claims of fraud against Joulé and Genatt, and AMP's breach of contract claims against Joulé. AMP appeals. We conclude that the employee exclusion does not foreclose AMP's claim against Liberty, but that Liberty is entitled to judgment as a matter of law on AMP's bad faith claims. We also conclude that there are genuine disputes of fact material to AMP's claims against Joulé and Genatt. Accordingly, we will affirm in part, vacate in part, and remand for further proceedings.

I.

AMP owns and operates a steel production facility in Conshohocken, Pennsylvania. In October 2005, AMP, operating at the time as ISG Plate, LLC, contracted with defendant Joulé, an industrial staffing and engineering firm, for the regular performance of maintenance and repair work at the Conshohocken plant. The terms of the agreement were set out in a contract ("Contractor Agreement"), which incorporated a separate document, drafted by AMP, entitled the General Terms and

3

Conditions for Agreements ("Terms and Conditions"). The Terms and Conditions obligated Joulé to maintain certain insurance, including a commercial general liability ("CGL") policy, and dictated that on such policies AMP "shall be added as an additional insured for all claims including, but not limited to, claims by [Joulé's] employees[.]" (App. 231.) The Terms and Conditions also required that the policy provide coverage "in an amount not less than $5,000,000 per occurrence." *Id.*

Predating its relationship with AMP, Joulé maintained a CGL policy issued by Liberty (the "Liberty Policy"). In May 2007, Genatt brokered Joulé's renewal of that policy, including the addition of AMP as an additional insured. Genatt then issued a certificate of liability insurance to AMP stating that the "certificate holder is included as additional insured as required by written contract." (App. 68.)

The policy contained a provision alternately known as an "employer's liability exclusion," an "employer's exclusion," or an "employee exclusion." The exclusion stated as follows: "[t]his insurance does not apply to . . . '[b]odily injury' to (1) [a]n 'employee' of the insured arising out of and in the course of (a) [e]mployment by the insured; or (b) [p]erforming duties related to the conduct of the insured's business[.]" (App. 296.) The same subsection defines "insured" as "any person or organization qualifying as such under SECTION II [entitled "WHO IS AN INSURED"]." (App. 295.) An endorsement to the policy amended Section II to "include as an insured any person or organization with whom you have agreed to add as an additional insured by written contract." (App. 260.) The policy also contained a severability clause, sometimes known as a "separation of insureds" clause, stating that "[t]his insurance applies: a. As if each

4

Named Insured were the only Named Insured; and b. Separately to each insured against whom claim is made or 'suit' is brought." (App. 308.) Lastly, the policy provided that Liberty had "the right and duty to defend the insured against any 'suit' seeking [bodily injury] damages," and that "[t]he amount [Liberty] will pay for damages is limited" to $1 million. (App. 295, 258.))

The course of dealing between the parties was such that each time Joulé provided temporary staffing to AMP, Joulé afterward sent an invoice to AMP for those services. AMP then remitted payment along with a purchase order describing the services provided. Each purchase order stated that the "AMUSA-100," and in some cases the "MUSA-100," applied to the order. Both of those documents are statements of terms unrelated to and materially different from the aforementioned Terms and Conditions.[1]

In January 2008, several Joulé employees, including a supervisor named William Greene, reported to AMP's Conshohocken plant to perform maintenance. While climbing down a ladder at the plant, Greene fell and seriously injured himself. Roughly twenty months later, in September 2009, Greene and his wife sued AMP for damages in the Court of Common Pleas of Philadelphia County. On January 6, 2011, about a month before the post-discovery settlement conference in the Greene litigation, AMP sent its initial demand for defense and indemnification to Joulé, requesting that Joulé "place [its] insurance carrier on immediate notice of this claim." (App. 384.) The letter attached Greene's complaint and stated that a pre-trial settlement conference was set for February

---

[1] Because AMP has abandoned any claim that the AMUSA-100, MUSA-100, or purchase orders have any legal bearing on its contractual relationship with Joulé, we will not expound upon the details of those differences.

5

7, 2011.  In the letter, AMP cited the AMUSA-100, and not the Contractor Agreement, as the governing contract.  On January 20, 2011, Joulé forwarded the letter to Genatt, together with a copy of the Contractor Agreement.  Joulé asked Genatt to forward both documents to Liberty and to request that Liberty assume defense of AMP in the Greene litigation.  Genatt complied.  Liberty received the documents on February 3, 2011.

On February 9, 2011, Liberty issued a denial letter on the basis that "there was no contract in existence between [AMP] and Joulé, Inc. for the date of loss of January 12, 2008."  (App. 343.)  The parties corresponded extensively prior to the Greene trial in September 2011, during which time AMP continued to offer the purchase orders and AMUSA-100 as evidence of a written contract, and Liberty continued to deny coverage.  In September 2011, without participation by Liberty, AMP defended Greene's claim at trial before a jury.  The jury found AMP negligent and awarded Greene and his wife a total of $1 million.

In November 2011, AMP brought the instant lawsuit, again citing the purchase orders and AMUSA-100 as a basis for relief from Joulé and Liberty.  In its answer, Liberty raised late notice as an additional ground for denying coverage.  On March 14, 2012, AMP filed an Amended Complaint, referring for the first time to the Contractor Agreement as a basis for its breach of contract claims, and adding Genatt as a defendant. The Amended Complaint includes claims against Joulé for breach of contract for failure to defend and indemnify under the purchase orders, breach of contract for failure to procure insurance as required by the Contractor Agreement, and fraud for representing falsely that such insurance had been obtained. It also includes a claim of fraud against

6

Genatt for misrepresenting that AMP was "an additional insured" under Joulé's CGL policy to the extent required by the Contractor Agreement. Lastly, AMP seeks relief from Liberty for breach of contract and bad faith denial of coverage.

On December 20, 2012, addressing cross-motions for summary judgment, the District Court granted judgment in favor of Appellees and against AMP on all claims. On January 3, 2013, AMP moved for reconsideration, which the District Court denied on January 18, 2013.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291 over the District Court's grant of summary judgment. Our review is plenary. *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 134 (3d Cir. 2013). A grant of summary judgment is appropriate where the movant establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the evidence "'in the light most favorable to the nonmoving party.'" *Trinity Indus., Inc.*, 735 F.3d at 134–35 (quoting *Kurns v. A.W. Chesterton Inc.*, 620 F.3d 392, 395 (3d Cir. 2010)).

## A.

We first address the District Court's grant of summary judgment in favor of Liberty and against AMP on Count V of the Amended Complaint, in which AMP alleges that Liberty breached its contractual obligations to defend and indemnify AMP with respect to the Greene litigation. That claim squarely implicates the main question presented by this appeal: whether the employee exclusion contained in the Liberty Policy

7

removes the Greene incident from coverage. Under AMP's interpretation of the exclusion, which it suggests is supported by New Jersey law, that provision does not bar an insured's claim for coverage as to a lawsuit brought by employees of a different insured on the same policy. Under Liberty's reading, which draws on Pennsylvania law, the employee exclusion does bar coverage under the circumstances at issue. We therefore turn to a choice-of-law analysis to determine which state's law is controlling.

1.

Where a federal court sits in diversity, the court must apply the choice-of-law rules of the forum state. *See Pac. Emp'rs Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012). Here the forum state is Pennsylvania, which employs a "flexible[] 'interest/contacts methodology'" to resolve contractual choice-of-law questions. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d Cir. 2007). We must therefore: (1) determine if the laws of the two states at issue conflict; (2) if they do, decide whether a "true conflict" exists insofar as "*both* jurisdictions' interests would be impaired by the application of the other's laws[;]" and (3) if a true conflict exists, resolve "which state has the 'greater interest in the application of its law.'" *Id.* at 230–31.

2.

AMP argues that New Jersey law applies since Joulé, the primary insured, is a New Jersey corporation and the contract was negotiated and delivered there. Under New Jersey law, insurance contracts are interpreted using context-specific principles of construction, with the understanding that the policy must be "liberally construed in favor of the insured and strictly construed against the insurer." *Shotmeyer v. N.J. Realty Title*

8

*Ins. Co.*, 948 A.2d 600, 605 (N.J. 2008) (quoting *Sandler v. N.J. Realty Title Ins. Co.*, 178 A.2d 1, 5 (N.J. 1962)). For instance, "[i]n the absence of ambiguity, an insurance policy should be interpreted according to its plain, ordinary meaning." *Id.* Where an ambiguity does exist, "courts interpret the contract to comport with the reasonable expectations of the insured . . . ." *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1264 (N.J. 2001). The test for ambiguity is whether the policy's phrasing is "so confusing that the average policyholder cannot make out the boundaries of coverage." *Weedo v. Stone–E–Brick, Inc.*, 405 A.2d 788, 795 (N.J. 1979).

Two New Jersey appellate courts, having considered the issue in considerable depth, have concluded that an employee exclusion does not bar coverage for claims against one insured by a different insured's employees. *See Md. Cas. Co. v. N.J. Mfrs (Cas.) Ins. Co.*, 137 A.2d 577, 582 (N.J. Super. Ct. App. Div. 1958) ("*Maryland Casualty*"), *aff'd*, 145 A.2d 15, 17 (N.J. 1958)[2]; *Erdo v. Torcon Constr. Co.*, 645 A.2d 806, 809 (N.J. Super. Ct. App. Div 1994). The District Court here attempted to distinguish *Maryland Casualty* and *Erdo*, noting that the Liberty Policy's exclusion defines "insured" as "any person or organization qualifying as such under SECTION II." (App. 33 (citation omitted).) That section, in turn, dictates that Joulé and AMP each qualify as an "insured" on the Policy. The Court then applied basic substitution to read the clause as follows: "[t]his insurance does not apply to . . . 'bodily injury' to . . . an

---

[2] Because the *Maryland Casualty* Superior Court opinion addresses the case in significantly greater detail than the Supreme Court opinion, and because the Supreme Court explicitly adopted the Appellate Division's treatment of the matter, our citations herein are primarily to the Superior Court opinion. *See* 145 A.2d at 17.

9

'employee' of [Joulé or AMP] arising out of and in the course of . . . [e]mployment by [Joulé or [AMP]]." (App. 32.)

We are unpersuaded that the New Jersey Supreme Court would adopt the same logic. The reference in the employee exclusion at issue here, like in both *Maryland Casualty* and *Erdo*, is to "*the* insured"—not to "*an* insured" or "*any* insured"—and as such is a specific, exclusive reference to a particular insured, rather than a general, inclusive reference to all insureds. *See Argent v. Brady*, 901 A.2d 419, 424–25 (N.J. Sup. Ct. App. Div. 2006) (distinguishing a reference from "an" or "any" insured from a reference to "the" insured). The question remains, however, whether the specific insured to whom the clause refers is the principal insured, or the insured making the claim. That question is answered by the policy's severability clause, which states that "this insurance applies . . . [a]s if each Named Insured were the only Named Insured; and . . . [s]eparately to each insured against whom claim is made or 'suit' is brought."[3] (App. 308.) *See Erdo*,

---

[3] Liberty argues that AMP waived its right to invoke the severability clause in the Liberty Policy on appeal by failing to do so before the District Court. While it is true that "arguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible to review . . . absent exceptional circumstances," *Birdman v. Office of the Governor*, 677 F.3d 167, 173 (3d Cir. 2012) (internal quotation marks omitted), "this rule 'is one of discretion rather than jurisdiction' and may be 'relaxed whenever the public interest . . . so warrants,'" *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 834–35 (3d Cir. 2011) (alteration in original) (citations omitted). As we have observed, "[t]he waiver rule serves two purposes: ensuring that the necessary evidentiary development occurs in the trial court, and preventing surprise to the parties when a case is decided on some basis on which they have not presented argument." *Id.* at 835. Neither purpose is at issue here. First, interpretation of an insurance contract is a purely legal question, and the entire Liberty Policy, including the severability clause, was of record in the District Court. Second, there can be no claim of surprise or prejudice because it is the court's role to interpret a contract as a whole. *C.H. Heist Caribe Corp. v. Am. Home Assurance Co.*, 640 F.2d 479, 481 (3d Cir. 1981). Moreover, AMP argued

645 A.2d at 809 (placing significant emphasis on the policy's severability clause). In light of the severability clause, the reference to "the insured" in the employee exclusion must be read, under New Jersey law, as referring to the insured making the claim, *i.e.,* AMP, and only to AMP. Thus, the employee exclusion serves to preclude coverage for a claim against AMP by one of its own employees.

Consequently, we find that the District Court's interpretation is not consistent with *Maryland Casualty* and *Erdo*. Instead we conclude that under New Jersey law, the employee exclusion contained in the Liberty Policy is not ambiguous, and does not bar AMP's claim for coverage as to a lawsuit brought by an employee of Joulé.

The long-standing rule under Pennsylvania law, by contrast, is that an employee exclusion in a CGL policy generally *does* bar coverage for claims against one insured by a different insured's employee. *See Pa. Mfrs.' Ass'n Ins. Co. v. Aetna Cas. & Surety Ins. Co.*, 233 A.2d 548, 550–52 (1967) ("*PMA*"). And we would have no difficulty finding the jurisprudence of the two states to be in conflict on the basis of *PMA* were it not for a recent decision of the Pennsylvania Superior Court, which suggests that *PMA*, although still good law, may not control in cases where the policy contains a severability clause distinguishable from that in *PMA*. *See Mutual Ben. Ins. Co. v. Politopoulos*, 75 A.3d

in the District Court, as it does before us, that the employee exclusion does not bar coverage for its loss, and we may consider the severability clause as additional support for AMP's argument. *See Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 221 (2d Cir. 2006) ("[A]ppeals courts may entertain additional support that a party provides for a proposition presented below." (citing *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 534 (1992)). For us to ignore the import of the severability clause would be to endorse a fiction that the Liberty Policy's terms are different from those in the record. Therefore, we will consider the relevance of the severability clause.

528, 536–37 (Pa. Super. Ct. 2013) (finding that because the severability clause at issue "directs [the court] to evaluate coverage as though the [other insured] *does not exist*," the employee exclusion does not bar coverage for a lawsuit against one insured filed by a different insured's employee).

We take no position at this time as to whether *Politopoulos* is an accurate reflection of Pennsylvania law as it would be decided by the Supreme Court of the Commonwealth. Instead, for the reasons stated below, we conclude that New Jersey has a greater interest in the application of its law and that New Jersey law therefore governs this case.[4]

3.

The final step in a choice-of-law analysis under Pennsylvania law is to decide "which state has 'the greater interest in the application of its law.'" *Hammersmith*, 480 F.3d at 231 (quoting *Cipolla v. Shaposka*, 267 A.2d 854, 856 (Pa. 1970)). We must weigh the parties' contacts and relationships with each state "on a qualitative scale according to

---

[4] Because there is an actual difference between Pennsylvania and New Jersey law in the context of interpreting the Liberty Policy, we take here the further analytical step of deciding whether there is a "true" conflict such that both states' interests would be impaired if we applied the other's laws. *Hammersmith*, 480 F.3d at 230. New Jersey has an interest in providing the broadest coverage possible for an insured by avoiding "technical encumbrances" and "hidden pitfalls" in the construction of insurance policies. *Karl v. N.Y. Life Ins. Co.*, 381 A.2d 62, 64 (N.J. Super. Ct. App. Div. 1977) (quoting *Kievit v. Loyal Protective Life Ins. Co.*, 170 A.2d 22, 26 (N.J. 1961)). To interpret the Liberty Policy under Pennsylvania law to bar coverage would run counter to this interest. On the other hand, Pennsylvania law gives broader effect to an employee exclusion, which is more favorable to the insurer. To interpret the Liberty Policy under New Jersey law to allow coverage to AMP, then, would run directly counter to that interest. The material difference between Pennsylvania and New Jersey law thus creates a true conflict.

12

their relation to the policies and interests underlying the [particular] issue." *Id.* at 231 (quoting *Shields v. Consol. Rail Corp.*, 810 F.2d 397, 400 (3d Cir. 1987) (alterations in original)).

The Restatement (Second) of Conflict of Laws, in an official comment, explains that in an insurance dispute, a court should generally give the location of the insured risk "greater weight than any other single contact." Restatement (Second) of Conflict of Laws § 193 cmt. b. Nonetheless, if the policy covers "a group of risks that are scattered throughout two or more states," the location of the risk has "less significance" to the choice-of-law determination. *Id.*[5] Because the Liberty Policy covers all of Joulé's operations, and because Joulé dispatches its employees to several states, the "location of the insured risk" is scattered among jurisdictions. We are thus obligated to consider a number of other factors: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* § 188(2). Considering these factors on a "qualitative scale," we conclude that New Jersey has a greater interest in the application of its law than Pennsylvania.[6] The contract itself was made in New Jersey, involved a New Jersey

---

[5] The authors of the Restatement expressed a preference "that only one set of laws govern a given insurance contract, and . . . disapproval of the possibility that the laws of different jurisdictions might apply to different risks under the policy." *Hammersmith*, 480 F.3d at 233 (quoting *United Brass Works, Inc. v. Am. Guar. & Liab. Ins. Co.*, 819 F. Supp. 465, 469 (W.D. Pa. 1992)).

[6] First, the place of contracting is New Jersey, which is where Liberty delivered the contract to Joulé. Second, Liberty does not rebut AMP's assertion that at least some

13

primary insured, and covered the diverse risks associated with the activities of that company across several states. This conclusion also renders less likely the possibility that Liberty and Joulé will face varying obligations under the same policy depending on the locus of the underlying tort.

In sum, we conclude that New Jersey law governs this case. Under New Jersey law, the employee exclusion in the Liberty Policy, construed in the context of the severability clause, does not bar AMP's claim. Accordingly, we will vacate the District Court's order granting Liberty's motion for summary judgment and denying AMP's motion for summary judgment on Count Five of the Amended Complaint, and remand for further proceedings consistent with the application of New Jersey law as described above.[7]

B.

---

of the negotiations took place in New Jersey. Third, the place of performance, and fourth, the location of the contract's subject matter, both extend into the several jurisdictions where Joulé sends its employees. Last, the parties are diverse. Liberty, the insurer, is a Massachusetts corporation with its principal place of business in Massachusetts. Joulé, the primary insured, is a New Jersey corporation with its principal place of business in New Jersey. And AMP, the additional insured, is subject to several layers of corporate ownership such that its principals are considered citizens of Nova Scotia, Quebec, and Luxembourg.

[7] Liberty voices other potential bars to relief for AMP on Count Five, such as the argument that AMP forfeited its contractual right to defense or indemnification for the Greene lawsuit by failing to provide timely notice of the claim, or the contention that Greene, as a temporary worker operating on AMP's premises, was an employee of both Joulé *and* AMP. Because the District Court has not yet had the opportunity to rule on the viability of these defenses, or the potential factual issues surrounding them, we will not address them here.

We next address AMP's claim that the District Court erred in granting summary judgment in favor of Liberty and against AMP on Count Six of the Amended Complaint, which states a claim for bad faith denial of coverage. Specifically, AMP argues that Liberty refused in bad faith to defend AMP in the Greene lawsuit despite being notified of the litigation approximately eight months before trial, and continues to refuse in bad faith to indemnify AMP for the damages incurred as a result of the Greene lawsuit.

The New Jersey Supreme Court has described the standards applicable to a claim for bad faith denial of insurance benefits as follows:

> To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. It is apparent, then, that the tort of bad faith is an intentional one. . . . . [I]mplicit in that test is our conclusion that the knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless . . . indifference to facts or to proofs submitted by the insured.

*Pickett v. Lloyd's*, 621 A.2d 445, 453 (N.J. 1993) (quotation marks omitted) (omissions in original) (quoting *Anderson v. Continental Ins. Co.*, 271 N.W.2d 368, 376–77 (Wis. 1978)). Where a claim is "fairly debatable," the record will not sustain a finding of bad-faith denial of coverage. *Id.* at 453; *see also Universal-Rundle Corp. v. Comm. Union Ins. Co.*, 725 A.2d 76, 89 (N.J. Super. Ct. App. Div. 1999). Instead, plaintiff must prove that "no debatable reasons existed for denial of the benefits." *Pickett*, 621 A.2d at 457.

Liberty points to expert testimony from Bernd Heinze, a claims handling expert, who concluded that under applicable law and industry standards, Liberty performed an "intelligent, honest, fair and reasonable review and investigation" into AMP's demand

15

for coverage. (App. 552.) Heinze cited three principal justifications for Liberty's denial. First, in AMP's initial demand letter, AMP did not cite the Contractor Agreement that AMP and Joulé now acknowledge governs this dispute. Instead, AMP erroneously predicated its claim for coverage on the Purchase Orders and AMUSA-100. Upon receiving AMP's demand, Liberty reviewed those documents, reasonably determined that they did not establish AMP's right to coverage, and invited AMP to provide additional documents in support of coverage. AMP continued to rely on the Purchase Orders and AMUSA-100 as the basis for its claim until after filing the Amended Complaint over a year later. Second, Liberty was justified in denying coverage because, under Heinze's view of the applicable law, the Contractor Agreement did not entitle AMP to coverage for bodily injury to a Joulé employee resulting from AMP's own negligence. Third, Heinze contends that Liberty was justified in denying coverage because of AMP's unduly late notice regarding the Greene lawsuit, which Heinze believes irreparably prejudiced Liberty's ability to defend the claim.

AMP, by contrast, relies upon evidence that Liberty had the Contractor Agreement in its possession since February 2011 at the latest, and suggests that throughout this dispute, "Liberty [has] had 'an action plan' to deny coverage to AMP based on a meritless ground." Appellant's Br. at 36–37 (citing App. 207). AMP's Statement of Undisputed Facts, however, attributes the phrase "action plan" to an email dated October 7, 2011, written by a "customer service representative" employed by Genatt. (App. 207.) And in any event, the quoted language is innocuous when taken in context. The email states: "The action plan is to continue to deny [AMP's] request for indemnification based

16

on the fact that there was no contract in place, only an invoice that was dated after the date of injury." *Id.* This is consistent with the undisputed evidence that AMP erroneously predicated its claim on the Purchase Orders and AMUSA-100 until AMP's filing of the Amended Complaint in March 2012.

The District Court gave two reasons for dismissing AMP's claim that Liberty denied coverage in bad faith: first, its finding that the employee exclusion barred AMP's claim in total, and second, the fact that AMP initially predicated its claim on the incorrect documents. For reasons already given, we conclude that the employee exclusion does not bar AMP's claim. Nonetheless, in light of the District Court's ruling and the Pennsylvania Supreme Court's holding in *PMA*, whether the employee exclusion bars AMP's claim presents a legal issue that is at least "fairly debatable." Moreover, AMP's misplaced reliance on certain irrelevant documents throughout much of this dispute, including up to and beyond the start of the instant litigation, is uncontested. Thus, because Liberty denied coverage based on factual and legal grounds that were at least plausible at the time of Liberty's decision, we conclude that Liberty is entitled to summary judgment on AMP's claim for bad faith denial of coverage. We will therefore affirm the District Court's order insofar as it grants Liberty's motion for summary judgment and denies AMP's motion for summary judgment on Count Six of the Amended Complaint.

C.

We next turn to AMP's claims against Joulé and Genatt. First, AMP alleges that Joulé breached the Contractor Agreement by not obtaining the requisite coverage for

17

AMP.  Second, AMP alleges that Joulé committed fraud by representing to AMP falsely or with reckless disregard that it had secured such insurance when in fact it had not.  Third, AMP alleges that Genatt too committed fraud when it falsely or with reckless disregard conveyed a certificate of insurance representing that AMP was an additional insured on Joulé's policy "as required by written contract."  (App. 68.)

The District Court addressed these claims only in passing.  The Contractor Agreement, according to the District Court, required only that AMP "shall be added as an additional insured" on Joulé's policy.  (App. 30.)  Because AMP was in fact named as an added insured, the District Court's logic goes, Joulé's contractual obligations were satisfied and neither Joulé nor Genatt made any misrepresentation to AMP.  The Court therefore granted summary judgment in favor of Joulé and Genatt.

As in most jurisdictions, the touchstone of contractual interpretation under New Jersey law is "the intention of the parties as revealed by the language used by them." *Homann v. Torchinsky*, 686 A.2d 1226, 1230 (N.J. Super. Ct. App. Div. 1997).  To discern that intent, "the court must consider the relations of the parties, the attendant circumstances, and the objects they were trying to attain."  *Id.* at 1231 (quoting *Tessmar v. Grosner*, 128 A.2d 467, 471 (N.J. 1957)).  Here, AMP sought to hire temporary laborers employed by Joulé, an independent contractor.  As part of that arrangement, AMP specifically required that Joulé carry standard CGL insurance, that AMP be named as an additional insured for all claims, including claims by Joulé's employees, and that such insurance provide for not less than $5 million in coverage per incident.

18

We believe that Joulé's obligation to name AMP as an additional insured for all claims, including claims by Joulé's employees, was not satisfied when AMP was named as an additional insured on an insurance policy that in effect excluded the coverage AMP explicitly sought. The relevant question with respect to AMP's claim for breach of contract, therefore, is whether the *scope* of the coverage provided, in practice, is in accord with the terms of the Contractor Agreement. In light of our holding that the employee exclusion in the Liberty Policy does not bar a claim for coverage for the Greene lawsuit, it appears that Joulé fulfilled at least some portion of its contractual obligations by obtaining CGL coverage for AMP as to bodily harm to Joulé employees. But AMP also notes that the Liberty Policy provides for only $1 million in coverage per occurrence, rather than the agreed-upon figure of $5 million.[8] As such, we will vacate the District Court's order insofar as it granted the motion of Joulé and denied the motion of AMP for summary judgment on Count Two, and on remand the District Court should again consider the parties' motions for summary judgment with specific consideration given to the policy's coverage limits.

We reach a similar conclusion with respect to AMP's claims against Joulé and Genatt for fraud. To succeed on a claim of fraud under New Jersey law, a plaintiff must

---

[8] Joulé argues that AMP has waived this argument on appeal by failing to raise it before the District Court. *See Webb v. City of Phila.*, 562 F.3d 256, 263 (3d Cir. 2009). Because we are vacating the District Court's ruling for its reliance on a flawed theory of Joulé's contractual obligations under the Contractor Agreement, we need not reach this question. We also express no view on Joulé's argument that AMP "tacitly consent[ed] to the reduced coverage limits by failing to object when provided with the Certificate of Liability Insurance expressly indicating the limits of the Liberty policy." Appellee Joulé's Br. at 18 n.4.

prove five elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997). These elements must be proved by clear and convincing evidence. *Atl. City Racing Ass'n v. Sonic Fin. Corp.*, 90 F. Supp. 2d 497, 504 (D.N.J. 2000) (applying New Jersey law). Here, we view AMP's claims as presenting the question of whether Joulé and Genatt committed fraud with respect to representations regarding the *scope* of AMP's coverage under the Liberty Policy. Because the District Court has had no opportunity to rule on Counts Three and Four in light of our conclusions above, which recast the factual issues implicated by these claims, we take no position other than to vacate the District Court's grant of summary judgment in favor of Joulé and Genatt and denial of AMP's cross-motion for summary judgment.

Lastly, in Count One of the Amended Complaint, AMP alleges that Joulé breached a contract made out by the purchase orders sent by AMP to Joulé after work was completed by Joulé employees. The District Court dismissed this claim after finding that the relationship between AMP and Joulé was governed by the Contractor Agreement. Because AMP voices no disagreement, we will affirm the District Court's order insofar as it grants Joulé's motion for summary judgment on Count One of the Amended Complaint and denies AMP's motion for summary judgment on that count.

IV.

20

In sum, we conclude that under New Jersey law, which we hold applies to this case, the employee exclusion contained in the Liberty Policy does not bar coverage for AMP with respect to the Greene litigation. We will therefore vacate the District Court's order of December 20, 2012 insofar as it grants summary judgment in favor of Liberty on AMP's claim for breach of contract in Count Five of the Amended Complaint. Likewise, we conclude that genuine issues of material fact exist with respect to AMP's claims against Joulé and Genatt in Counts Two, Three, and Four, and will vacate the District Court's order accordingly. Because we agree that Liberty is entitled to summary judgment on AMP's claim for bad faith denial of coverage in Count Six, and that Joulé is entitled to summary judgment on AMP's claim for breach of contract in Count One, we will affirm the District Court's order in those respects. We will remand for further proceedings consistent with this Opinion as necessary.